**Edward Leroy HARRIS, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Feb. 28, 1996.

Permission to Appeal Denied by Supreme Court Feb. 3, 1997.

Paul J. Morrow and Brock Mehler, Nashville, for Appellant.

Charles W. Burson, Attorney General and Reporter, Christian S. Chevalier, Assistant Attorney General, Criminal Justice Division, Nashville, Al C. Schmutzer, Jr., District At-

torney General, Richard Vance, Asst. District Attorney General, Sevierville, for Appellee.

## *OPINION*

HAYES, Judge.

The appellant, Edward Leroy Harris, alias "Tattoo Eddie," seeks post-conviction relief from his convictions of one count of armed robbery and two counts of premeditated first degree murder, entered by the Circuit Court of Sevier County in May, 1988, and the consequent imposition of one sentence of life imprisonment and two sentences of death by electrocution. The convictions and sentences were affirmed on appeal by the Tennessee Supreme Court. *State v. Harris,* 839 S.W.2d 54 (Tenn.1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

On August 10, 1993, the appellant filed a petition for post-conviction relief. On November 29, 1993, the post-conviction court conducted a hearing on the merits of the appellant's petition. At the conclusion of the hearing, the post-conviction court denied the petition. A written judgment of dismissal was filed on December 6, 1993.

The appellant raises the following eight issues on appeal:

(1) Whether the appellant received the effective assistance of counsel at trial and on appeal;

(2) Whether the post-conviction court erred by denying the appellant's motion for an *ex parte* hearing and support services;

(3) Whether the post-conviction court abused its discretion in denying the appellant's motion to recuse;

(4) Whether the post-conviction court abused its discretion in denying the appellant's motion for a continuance;

(5) Whether the evidence presented at trial was sufficient to establish the elements of premeditation and deliberation and whether the instructions to the jury on premeditation and deliberation misled the jury;

(6) Whether the use of the felony murder aggravating circumstance violated the holding in *State v. Middlebrooks;*

(7) Whether the jury was prevented from considering lesser included offenses by the use of a sequential jury instruction; and

(8) Whether Tennessee's death penalty statute is constitutional.

After reviewing the record, we affirm the judgment of the post-conviction court.

## *BACKGROUND FACTS*

The appellant was convicted of the September 13, 1986, murders of two employees of the Rocky Top Village Inn in Gatlinburg. Also charged in the murders were Kimberly Pelley, the appellant's girlfriend; Joseph De-Modica, a Georgia state penitentiary acquaintance of the appellant; and transvestite, Rufus Doby, also known as Ashley Silvers. At trial, two key sources of evidence for the State were the testimony of the co-defendant, DeModica, which implicated the appellant in the murders, and a letter describing the murders, recovered in a phone booth near the police station in Maggie Valley, North Carolina.

At trial, Joseph DeModica testified that, on the day of the murders, he, Doby, Pelley, and the appellant drove to Gatlinburg. Following a visit to the Great Smoky Mountains National Park, the group drove to the Rocky Top Village Inn. DeModica observed the appellant, Pelley, and one of the victims, Melissa Hill, enter the motel room in which Hill's body was subsequently discovered. Pelley carried a knife in her hand. DeModica remained in the parking lot. He heard several screams. A security guard, Troy Valentine, arrived, but encountered the appellant, who had come out of the motel room. Valentine and the appellant began to fight. Pelley also came out of the motel room, took the guard's flashlight, and struck him over the head with it. The appellant and Pelley then dragged Valentine into the motel room. DeModica heard two gunshots. He testified that, when the appellant and Pelley again came out of the motel room, they looked as if someone had sprayed them with red paint.

The State presented evidence to corroborate various aspects of DeModica's testimony. For example, with respect to the knife

that DeModica observed in Pelley's hand, an acquaintance testified that the appellant carried a lock-blade knife and a hunting knife with a serrated edge. Moreover, each victim suffered a deep neck wound from a serrated knife. Each victim had also been shot in the head. The massive amount of blood at the crime scene and the number of injuries inflicted upon each victim were consistent with DeModica's description of the appellant and Pelley following the murders. Finally, DeModica knew that Valentine had been clubbed with his flashlight. This information was not released to the media and would have been known only to the killers.

The Maggie Valley letter, which was found three days after the murders, also contained information which only the killers would have known. The State's document examiner excluded DeModica, Pelley, and Silvers as the writer of the letter. Expert testimony further established strong indications that the appellant wrote this letter. A former girlfriend of the appellant, Antonia Jones, identified the handwriting in the Maggie Valley letter as being that of the appellant.

Following his arrest, the appellant made a series of statements to Tennessee Bureau of Investigation agents and Georgia law enforcement officers. Initially, the appellant denied going to Gatlinburg. However, he subsequently stated that he and his companions had eaten in a restaurant in Pigeon Forge, and that, while he and Pelley were in Gatlinburg with DeModica and Silvers, he had purchased a chain for Pelley. He denied participating in the killings and implied that DeModica and Silvers were the murderers.

The appellant did not testify at the guilt phase of his trial. Essentially, his defense, as advanced through the appellant's statements to the police following his arrest, was a denial of any participation in the crime.

However, reviewing the sufficiency of the evidence on direct appeal, the supreme court remarked that "the overwhelming evidence supported the verdict of the jury...." *Harris,* 839 S.W.2d at 76. Similarly, the post-conviction court observed, "And the proof came in. The proof continued to come in.... This evidence as it rolled in, was overwhelming."

At the penalty phase of the trial, the State introduced the appellant's prior convictions involving violence to the person and otherwise relied upon the proof introduced during the guilt phase.[1] Defense counsel initially indicated that they would offer no proof during the penalty phase. However, following a conference with the trial judge in chambers, the appellant testified on his own behalf. The appellant stated that he was 32 years old and grew up in North Carolina. He informed the jury that he had only completed the third grade in school and could neither read nor write. He admitted that his difficulties in school stemmed largely from a lack of motivation. The appellant further testified that, during his youth, his relationship with his parents was troubled, and that he left home at the age of 14. The appellant admitted that, when he was 18, he pled guilty to several offenses in Georgia and spent 10 years in the Georgia penitentiary. While at the penitentiary, the appellant became involved in the Golden Gloves boxing program and won several trophies. The appellant testified that he has two children by a prior marriage, whom he visited on occasion. In conclusion, he asked that the jury spare his life.

The jury imposed the punishment of death, finding that three aggravating circumstances, Tenn.Code Ann. § 39–2–203(i)(2), (5), and (7) (1982),[2] outweigh any mitigating circumstances.

---

1. The prior convictions were for the offenses of rape, aggravated robbery, and aggravated sodomy.

2. Tenn.Code Ann. § 39–2–203(i)(2), (5), and (7) provide as follows:

 (2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

 (5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and

 (7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny,

 ....

## INEFFECTIVE ASSISTANCE OF COUNSEL

When a claim of ineffective assistance of counsel is raised, the burden is upon the appellant to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Thus, the appellant must prove that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *and* the appellant must demonstrate that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The appellant must establish *both* deficient performance *and* prejudice in order to prevail. *Id.* A reviewing court need not consider the two prongs of *Strickland* in any particular order. *Id.* at 697, 104 S.Ct. at 2069. Moreover, if the appellant fails to establish one prong, a reviewing court need not consider the other. *Id.*

With respect to deficient performance, the proper measure of attorney performance is reasonableness under prevailing professional norms. *Id.* at 688, 104 S.Ct. at 2065. In other words, the attorney's performance must be within the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975); *Wright v. State,* No. 01C01–9105–CR–00149, 1994 WL 115955 (Tenn. Crim.App. at Nashville), *perm. to appeal denied,* (Tenn.1994), *cert. denied,* 513 U.S. 1163, 115 S.Ct. 1129, 130 L.Ed.2d 1091 (1995). This court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. We should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Wright,* No. 01C01–9105–CR–00149 (citing *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn.1982)). Additionally, this court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689–690, 104 S.Ct. at 2065–2066. Finally, we note that defendants are not entitled to perfect representation, only constitutionally adequate representation. *Harries v. State,* No. 833, 1990 WL 125023 (Tenn.Crim.App. at Knoxville, August 29, 1990), *perm. to appeal denied,* (Tenn.1991).

In order to establish prejudice, the appellant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

At the conclusion of the hearing in this case, the post-conviction court entered the following findings of fact:

(1) Mr. Sexton, Mr. Goddard, and Mr. Strand (appointed appellate counsel) had supporting staff and resources, including the Capital Case Resource Center, to utilize in the preparation for trial and the anticipated appeal.

(2) Defense counsel utilized every advantage available to them under the law and the facts as they found them. Defense counsel investigated every fact related to them by the petitioner, pursued every lead and prepared as best as they were enabled by the defendant.

(3) The defendant/petitioner did not at any time furnish information to defense counsel that would have justified seeking special support services, and they were diligent in not pursuing a mental investigation.

(4) Defense counsel did all they could to prevent the introduction of incriminating evidence and to discredit it to the extent they could when it was introduced over timely objection.

In denying the appellant's petition, the post-conviction court described counsel's trial performance in the following manner: "... [W]ell tried. Ably tried. Diligently tried. Conscientiously tried...."

In post-conviction proceedings, the appellant has the burden of proving the allegations in his petition by a preponderance of the evidence. *McBee v. State*, 655 S.W.2d 191, 195 (Tenn.Crim.App.1983). *See also State v. Buford*, 666 S.W.2d 473, 475 (Tenn. Crim.App.1983), *perm. to appeal denied*, (Tenn.1984). Moreover, "[t]he findings of fact and conclusions of law made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict; this court will not set aside the judgment of the trial court unless the evidence contained in the record preponderates against its findings." *State v. Dick*, 872 S.W.2d 938, 943 (Tenn. Crim.App.), *perm. to appeal denied*, (Tenn. 1993); *see also Harries*, No. 833. The appellant contends that the evidence preponderates against the judgment entered by the post-conviction court that the appellant was afforded effective assistance of counsel.

At the post-conviction hearing, the appellant called Charles Sexton, one of the appellant's trial attorneys. Sexton was appointed to represent the appellant immediately following the appellant's arraignment in December, 1987.[3] Sexton has been licensed to practice law in this state since 1979. At the time of his appointment, he was serving as the attorney for a local indigent defender program created by private act for Sevier County. Additionally, Sexton remained active in the private practice of law as a partner in a local law firm. He had an extensive criminal trial practice, and, in 1987, was averaging twenty to twenty-five felony cases each term of court. Before his appointment to this case, Sexton had represented ten or more defendants charged with some degree of homicide, including several charged with capital first degree murder.[4] Shortly after the appointment of Sexton to represent the appellant, the State announced its intention to seek the death penalty, and the trial court appointed William Goddard as co-counsel. The record reflects that Goddard was an experienced trial lawyer in both the civil and criminal areas of the law.[5] Both Sexton and Goddard utilized various members of their respective law firms, primarily in the area of legal research, throughout the course of the appellant's trial.

## I. Guilt Phase

Sexton testified at the post-conviction hearing that, in preparation for the guilt phase of the trial, he visited the crime scene, interviewed potential witnesses, and obtained and reviewed discovery information concerning handwriting exemplars and autopsy reports. Additionally, proof at the hearing established that trial counsel conducted pre-trial interviews with all of the State's material witnesses on at least one occasion. Finally, Sexton testified that he spent a great deal of time on the case, and that, between January and May of 1988, "there were very few days that went by that at least some portion of the day wasn't spent dealing with some issue on the case." Benjamin Strand, Goddard's former law partner, who assisted in the appeal after Goddard's death, testified that Goddard also spent a great deal of time on the appellant's case and, in fact, devoted the two weeks prior to trial exclusively to trial preparation.

Nevertheless, the appellant argues that trial counsel's performance at the guilt phase of the trial was not within the range of competence demanded of attorneys. Specifically, he contends that defense counsel failed to reasonably investigate the authorship of the Maggie Valley note and failed to properly advise the appellant of the consequences of his refusal to provide additional handwriting exemplars. Moreover, the appellant asserts that counsel failed to adequately investigate the co-defendant DeModica's background and the autopsy and crime scene evidence. Finally, he contends that defense counsel's performance was deficient in that counsel failed to object to Dr. Blake's testimony concerning

---

3. The appellant was arrested on December 16, 1987, in Atlanta, Georgia.

4. The record indicates that the case before us is the first capital case to culminate in a jury verdict of death in Sevier County during this century.

5. Goddard did not testify at the post-conviction hearing, as he was killed in an automobile accident approximately eight days after the completion of the appellant's trial.

the victims' wounds and failed to move to suppress the appellant's statements to the police.[6] We conclude that the appellant has failed to carry his burden of proof, and that the evidence in the record preponderates in favor of the post-conviction court's judgment.

█ With respect to counsel's investigation of the Maggie Valley letter, we initially note that the appellant was afforded, at the trial level, the opportunity to exonerate himself as the author of the Maggie Valley letter, which opportunity he rejected. Indeed, the Tennessee Supreme Court, on direct appeal, observed:

It is clear from the record that from at least late February 1988, three months before trial, the defendant knew that the State was seeking handwriting samples and was consulting an expert. The Defendant was aware of ... the significance of the handwriting issue. When the court ordered additional samples, the Defendant refused to comply.

*Harris*, 839 S.W.2d at 67. Thus, the appellant cannot now attribute to counsel's performance a situation which he, himself, created. Tenn.R.App.P. 36(a); *see also Waterhouse v. Perry*, 195 Tenn. 458, 260 S.W.2d 176, 178 (1953).

█ Moreover, the record reveals that counsel's investigation was constitutionally adequate. Prior to trial in this case, defense counsel contacted a handwriting expert, James Kelly, an agent with the Georgia Bureau of Investigation, and filed a motion for a certificate of need for Kelly. However, the information that they obtained from Kelly was ultimately no more conclusive than the opinion of the State's expert, Thomas Vastrick, a document examiner with the United States Postal Service. The record reflects that defense counsel reviewed Vastrick's reports, and that Goddard interviewed Vastrick on at least one occasion. With respect to Vastrick's opinion, Sexton testified that defense counsel "felt very comfortable in what Mr. Vastrick's position was. That he couldn't say that Mr. Harris was the author of that note." Faced with two inconclusive

opinions, counsel could reasonably determine that the possibility of obtaining a favorable expert opinion was outweighed by the risk that counsel would merely provide the State an adverse expert opinion. *See Dees v. Caspiri*, 904 F.2d 452, 455 (8th Cir.), *cert. denied*, 498 U.S. 970, 111 S.Ct. 436, 112 L.Ed.2d 419 (1990).

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

*Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987). Defense counsel made a reasonable strategic decision to forgo further investigation and rely at trial upon the cross-examination of the State's expert witness.

Unfortunately, defense counsel was informed only a few days prior to trial of another witness, Antonia Jones, who was familiar with the appellant's handwriting. When, on the first day of trial, defense counsel learned that both Antonia Jones and Vastrick were to testify, counsel requested an opportunity to have an independent expert examine the Maggie Valley letter and the appellant's handwriting. The trial court denied the request, holding that the request came too late. In any event, defense counsel vigorously cross-examined Jones. Moreover, counsel was able to locate and interview Jones' mother, Julia Jones. Mrs. Jones testified for the defense in an attempt to discredit her daughter's testimony. Based upon the foregoing, we cannot conclude that counsel's performance was deficient.

6. The appellant also alleges that counsel failed to adequately investigate the appellant's mental condition at the guilt, penalty, and direct appel-

late stages of these proceedings. We fully address this issue in our discussion of the penalty phase.

■ The appellant also claims that counsel failed to properly advise him of the consequences of his refusal to comply with the trial court's order to provide additional handwriting exemplars. This issue, the appellant contends, is significant in view of the trial court's ruling that his refusal could be considered by the jury as an inference of guilt. However, the post-conviction court found that the appellant was advised of the consequences of his refusal "repeatedly, and intently." The record supports the finding of the post-conviction court. At the post-conviction hearing, Sexton was asked whether he recalled informing the appellant of the inferences that could be drawn at trial from the appellant's failure to submit additional samples. Trial counsel responded, "I believe .we talked about it at the bench on the 11th. I believe that it was probably talked about at the hearing in Dandridge.... We talked with Mr. Harris about it. And I know it was brought up on this occasion. And I believe probably at one or two other occasions in the proceedings." This contention is without merit.

■ The appellant next complains that defense counsel failed to reasonably investigate the background of co-defendant, Joe DeModica. Counsel testified at the post-conviction hearing that he examined DeModica's criminal record. The appellant contends that defense counsel should have further investigated DeModica's past in order to determine whether DeModica has a propensity for violence. The appellant argues that such information would have rebutted DeModica's claim that he was afraid of the appellant and was "forced" to remain with the appellant throughout this criminal episode. Sexton testified at the post-conviction hearing that he did not investigate DeModica's background more thoroughly "because Mr. Demodica had been around many parts of the country, and had lived in many areas, and had a record from many areas of this country." Nevertheless, the appellant asserts that defense counsel should have requested funds for an investigator. Initially, "in considering claims of ineffective assistance of

counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger*, 483 U.S. at 794, 107 S.Ct. at 3126 (citation omitted). Moreover, there is nothing in the record that would have triggered further investigation by defense counsel of DeModica's background.[7] Thus, we cannot conclude that further investigation was constitutionally compelled.

■ The appellant contends that counsel was ineffective for failing to request funds for an expert to review the findings of Dr. Blake, the State's expert in forensic pathology. However, the appellant does not state what, if anything, in Dr. Blake's report is erroneous or explain why his findings are suspect. The record reflects that, prior to trial, defense counsel examined Dr. Blake's reports and interviewed Dr. Blake. Again, we cannot conclude that counsel's performance was deficient.

■ The appellant also claims that counsel erroneously failed to object to Dr. Blake's testimony at trial that two of the victims' wounds had "serrated margins." The record reveals that defense counsel did, in fact, object to the introduction of Dr. Blake's testimony, citing the State's failure to comply with discovery rules. Prior to trial, defense counsel had repeatedly requested any additional reports by Dr. Blake, yet no additional reports were furnished until trial. At trial, the State delivered to defense counsel for the first time a report by Dr. Blake, describing Dr. Blake's observations at the crime scene. The trial judge overruled defense counsel's objection to Dr. Blake's testimony, concluding that Dr. Blake was an ordinary witness with respect to the matters contained in the report. However, the judge invited the defense to renew their objection if Dr. Blake's testimony touched on an area of expertise of which the defense had not received notice. At trial, Dr. Blake did, in fact, testify concerning wound analysis, conducted only a few days prior to trial, and the "sharp, sawtoothed markings" surrounding two of the wounds. The defense failed to make a con-

---

7. The appellant mentions in his brief that DeModica exploded and struck at his counsel during his sentencing hearing. The record before us does not reveal whether this incident in fact occurred, or whether defense counsel were aware of the incident, assuming that it occurred.

temporaneous objection. However, counsel vigorously cross-examined Dr. Blake, who conceded that he had not compared the victim's wounds to any knife involved in the investigation. Thus, even if defense counsel's failure to contemporaneously object constituted deficient performance, we conclude that such error did not unduly prejudice the defense.

■ Finally, the appellant complains that counsel did not attempt to suppress statements made by the appellant to law enforcement officers. However, the record reveals that the statements were not inculpatory, but rather exculpatory. The statements were general denials of participation in the killings and were in conformity with the appellant's position at trial that he was not present during the criminal episode. Counsel testified at the post-conviction hearing that, at the time of trial, he "didn't feel [that the statements] would become relevant ... but if they did, [h]e didn't mind ... the exculpat[ory] part getting in." The appellant has not demonstrated that this strategic decision of counsel was deficient performance.

We conclude that the appellant has failed to establish his allegations of ineffective assistance of counsel at the guilt phase of the trial by a preponderance of the evidence.

## II. Penalty Phase

The appellant also contends that he was afforded ineffective assistance of counsel at the sentencing phase of the trial. Again, in imposing two death penalties, the jury found that the appellant had previously been convicted of one or more felonies involving the use or threat of violence to the person, that the murders were especially heinous, atrocious, or cruel, and that the murders were committed while the appellant was engaged in a robbery. Tenn.Code Ann. § 39–2–203(i)(2), (5), and (7). The jury further found that these aggravating circumstances outweigh any mitigating factors. The appellant argues that defense counsel failed to adequately prepare for the sentencing phase of the trial. Specifically, the appellant asserts

that counsel failed to adequately investigate and obtain available evidence regarding the appellant's background and mental condition.[8]

■ At the penalty phase, defense counsel offered no proof, other than the appellant's testimony, in support of mitigation. Our supreme court has observed that there is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. *State v. Melson*, 772 S.W.2d 417, 421 (Tenn.), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). However, "[a] strategy of silence may be adopted only after a reasonable investigation for mitigating evidence or a reasonable decision that an investigation would be fruitless." *Tafero v. Wainwright*, 796 F.2d 1314, 1320 (11th Cir.1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 782 (1987). Courts have held counsel's representation beneath professionally competent standards when sentencing counsel did not conduct enough investigation to formulate an "accurate life profile" of a defendant. *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir.), *cert. dismissed*, —— U.S. ——, 116 S.Ct. 38, 132 L.Ed.2d 919 (1995). We note that the extent of investigation required depends critically upon information supplied by the defendant. *Burger*, 483 U.S. at 795, 107 S.Ct. at 3126. *See also Whitmore v. Lockhart*, 8 F.3d 614, 621 (8th Cir.1993).

> [W]hen the facts that support a certain line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Burger*, 483 U.S. at 795, 107 S.Ct. at 3126.

In this case, defense counsel did not act "in a factual void in an unjustified manner." *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th

---

8. The *only* feasible mitigating, factors available to the appellant were mental disease or defect, pursuant to Tenn.Code Ann. § 39–2–203(j)(8)

(1982), and his troubled background, pursuant, generally, to Tenn.Code Ann. § 39–2–203(j) (1982).

Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984). With respect to the appellant's background, Sexton testified at the post-conviction hearing that he spoke with the appellant "many, many times." Moreover, during an early interview, Sexton utilized a standardized eight to ten page form to gather background information from the appellant. Trial counsel acknowledged that he was familiar with the appellant's limited educational background and the fact that he had resided in institutions in North Carolina as a juvenile and in penal institutions as an adult. Sexton testified that the appellant was "able to outline where he had been and . . . why he was there." Sexton also contacted the appellant's mother in Georgia on two occasions. Defense counsel asked the appellant's mother to testify at the sentencing hearing. She refused to participate.

Sexton attempted to contact other individuals whose names were supplied by his client, but to no avail as they could not be found. Sexton testified at the post-conviction hearing that "it was hard to find somebody that would take an interest in this man, and would make an effort to come up here and . . . and show some concern for him. And it got down to the point where it looked like it was just me and Bill Goddard, and nobody else was going to give a hoot about what happened to this man."

Thus, the appellant and his mother were the primary sources of background information relevant to the sentencing phase of the appellant's trial. Sexton indicated that the information obtained from the appellant and his mother suggested that further investigation would be unproductive. Sexton stated that if he "had thought anything would have helped this man, [he] would have had it [at the sentencing hearing]."

 Sexton admitted that defense counsel did not request funds for investigative services. However, "[u]nder certain circumstances, trial counsel's decision not to investi-

gate family childhood background may legitimately be the product of a reasoned tactical choice. Given the particular circumstances of [a] case including, among other things, the fact that [a defendant] [is] thirty-one years old when he murder[s] [the victim], evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight." *Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir.1990), *cert. denied*, 500 U.S. 910, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991). The appellant in this case was approximately thirty years of age at the time of the murders.

With respect to the appellant's mental health, Sexton testified that he and Goddard discussed the possibility of requesting a psychological evaluation of the appellant, but concluded that there was no evidence that any such evaluation was warranted. At the post-conviction hearing, Sexton testified:

> But at no point in time, during this proceeding did I ever feel like Mr. Harris was less than competent. He always communicated with us. He was always very cooperative with us. He always talked very freely with us. Was able to understand the questions when we would ask them, was able to give us answers. And, frankly, was . . . was as cooperative as you could ask him to be. In most areas. Now there were some things we had some difficulties with. But as far as him understanding, and having any mental deficiencies, I was never . . . it really never became an issue . . . with me.[9]

We note that the post-conviction court also observed, "This court has noticed nothing to indicate anything to raise a question about this defendant's ability to understand these proceedings and defend himself, participate in them." Finally, trial counsel testified that at no time during any pre-trial interview did the appellant mention a learning disability. Furthermore, the appellant never alluded to any psychological problems or any past treat-

9. At the post-conviction hearing, the appellant filed as an exhibit medical records from the Sevier County jail which show that, prior to trial, the appellant was given Haldol and Xanax, because he was suffering some anxiety and depression and was experiencing difficulty sleeping. A "Statement of General Health Condition" noted that the appellant is allergic to Thorazine. Arguably, these records would not have alerted defense counsel that the appellant was suffering any psychological difficulties other than those understandably experienced by one awaiting trial for the murders of two individuals where the State was seeking the death penalty.

ment or institutionalization for psychological disorders.

■ Thus, we conclude that defense counsel's performance was constitutionally adequate at the penalty phase. Moreover, the appellant suffered no prejudice as a result of counsel's performance. We base our conclusion upon the findings of Robert Steele, an investigator for the Capital Case Resource Center. At the post-conviction hearing, Steele testified that, after the appointment of Brock Mehler and Paul Morrow, attorneys for the Capital Case Resource Center, he began interviewing and collecting records in an attempt to identify mitigating themes. In addition to interviewing the appellant and his mother, the investigator contacted one hundred and forty individuals by phone or letter and received twenty-three responses. Steele's conclusions are summarized in his affidavit, submitted in support of the appellant's motion for support services.

Steele states in his affidavit that the appellant's father, Artie Harris, died in an automobile accident when the appellant was four years old. Following his father's death, the appellant's mother, Merlene Harris, lived with a man, Bob Turner, who physically abused both the appellant and his mother. The appellant and his brother were then placed in foster homes, where they remained until Mrs. Harris married a man named Melvin Nelms. The family moved to North Carolina. At this time, the appellant began running away from home, and was placed in various foster homes and institutions, including the Western Carolina Center.[10]

Concerning the appellant's mental health, the affidavit reflects that his mother was hospitalized for measles and pneumonia while pregnant with the appellant. Furthermore, at the age of two, the appellant was struck by a car and suffered a severe head injury. While attending school, the appellant was placed in special education classes. As an adult, the appellant used drugs. While incarcerated at the Georgia penitentiary, the appellant was "stabbed in the head." While incarcerated at the DeKalb County Jail in Georgia, the appellant attempted to commit suicide. Finally, the appellant contends that the Western Carolina Center records indicate that he is "mentally defective" and has an I.Q. of 65; that, in 1966 and 1967, the appellant was diagnosed as "brain damage[d];" and that, in 1969, the Western Carolina Center diagnosed him as mentally retarded.

Assuming the accuracy of Steele's findings, we conclude that neither these findings nor the Western Carolina Center records are uniformly helpful to the appellant. *See, e.g., Whitmore,* 8 F.3d at 623. While many people have unhappy childhoods, few brutally murder two people. *Strouth v. State,* 755 S.W.2d 819, 827 (Tenn.Crim.App.1986). Moreover, the Western Carolina Center records document the appellant's propensity to engage in violent or antisocial behavior and may well have alienated the jury had they been introduced at the penalty phase of the appellant's trial. Finally, contrary to the appellant's assertion, the record before us establishes that further investigation by trial counsel of the appellant's mental condition would not have changed the jury's sentencing determination. In other words, further investigation would not have produced facts sufficient to tip the scales in favor of a sentence other than death.

The information contained in the Western Carolina Center admission and progress notes is ambiguous.[11] The initial admission interview with the Western Carolina Center, dated March 17, 1969, consisted of an interview with the appellant's mother, who was attempting to place her son at the Center. At the time of the interview, the appellant had completed two one-year commitments with the Juvenile Evaluation Center and was eligible for release. The records do not identify the particular state agency under which either center is operated i.e. mental health, education, social services, or correction. The

---

10. We note that, other than Steele's testimony, there is no proof in this record that the Western Carolina Center is a state institution for the mentally retarded.

11. The admission and progress notes were prepared by social workers. They frequently fail to cite the source of information included in the notes and provide no documentation to establish the accuracy of the information.

records do reflect that the appellant's placement in the Juvenile Evaluation Center, pursuant to a juvenile court order, resulted from the appellant's frequent attempts to run away from home.

An initial report notes that the appellant is "an ambulatory, fully verbal, 11-year old boy with a serious behavior problem." The social services worker further observed, "Mrs. Nelms [the appellant's mother] told me that Eddie has 'brain damage' and is 'disturbed.' . . . I feel that the unstable home situation has played a very large role in Eddie's behavior. . . . *'Brain damage' is the alibi she prefers to use to cover up her own inadequacies as a mother.*" (Emphasis added).

The same report recites the following, "Dr. Nale at the Evaluation Center at Western Carolina University, has told Mr. and Mrs. Nelms [the appellant's parents] that Eddie's I.Q. was 'approximately average.' " In the only documented examination of the appellant by a physician, the physician concluded that the appellant suffered "[m]ild mental retardation *on a [s]ocio-cultural basis.*" (Emphasis added).

Only one psychological report is contained in the Center's records. A school psychologist prepared this report, dated July 14, 1970. The psychologist conducted a personal interview with the appellant. Additionally, the psychologist administered a number of psychological tests to determine the appellant's level of functioning. The psychologist concluded:

> Eddie has assumed a style of aggression, retaliation, and lack of patience with others and himself, which would indicate little toleration for formal school structure and any other formal environment. Rules and regulations and good behavior frustrate him. . . . *I have no facts or reasons to suspect that he is mentally retarded.* His social behavior is so immature that it seems he is functioning as a poorly adjusted six year old. . . . He also shows indications that he can grasp a good deal of academically related material on a concrete level and that he could learn to develop moderate academic skills.

(Emphasis added).

The "Admission Summary" from the Western Carolina Center does reflect that "[a]t one time [the appellant was] on Prolixin and had reaction to this with his eyes rolling back and getting stiff." However, contrary to Steele's affidavit, there is nothing in the Center's records to indicate that the appellant was ever administered Thorazine, much less "medicated with thorazine the entire time."

The above conclusions contradict the following undocumented observation in the Western Carolina clinical record: "Eddie has been quite healthy in general. His diagnosis by Dr. Nale at Cullowhee was brain damage 2½ years ago." They similarly contradict the following comment, included in an additional report of the Western Carolina admission interview: "The psychological report from the Juvenile Evaluation Center indicated that Eddie is 'mentally defective, mild with behavior disorder.' He achieved an I.Q. of 65."

The last report from the Western Carolina Center, prepared by the appellant's social worker on May 3, 1971, reveals the following:

> Presently, Eddie is not on campus. He recently went home with his mother on a 30 day trial visit, contrary to the staff's recommendations. This occurred after Eddie's most recent AWOL episode. . . . Since Eddie's admission to the Center, he has presented many problems. He refuses to follow his scheduled routine and frequently wanders about doing as he pleases. He has a problem taking orders from and relating to people in authority. Running away has also proved to be a great problem with Eddie. . . . [T]he family is very unstable and the prognosis for Eddie's getting along well at home on this 30 day trial visit is very poor. I have seen little progress in my work with this family and feel that here, too, the prognosis for much improvement in this family's pattern of relationships and the mother's functioning in her role as wife and mother is poor.

Finally, assuming once again the accuracy of information contained in Steele's affidavit and considering the aggravating circumstances of this case, we conclude that the appellant has failed to meet his burden under *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. "It cannot be gainsaid that the cruelty of the

[murders] made it more difficult for [the appellant] to alter the final sentence by adducing mitigating circumstances." *Elledge v. Dugger*, 823 F.2d 1439, 1447 (11th Cir.1987). This issue is without merit.

## MOTION FOR *EX PARTE* HEARING AND SUPPORT SERVICES

The appellant contends that the post-conviction court erred by denying his motion for an *ex parte* hearing and for support services. The basis of the appellant's motion is that his "claim of ineffective assistance of counsel involves a number of areas where the service of an expert is 'the single means of establishing prejudice.'" Specifically, the appellant contends that the appointment of a document examiner, a forensic pathologist, a criminal investigator, and a psychologist are necessary to protect his Sixth Amendment right to the effective assistance of counsel.

The post-conviction court denied the appellant's motion. Relying upon this court's decision in *Teague v. State*, 772 S.W.2d 915, 927 (Tenn.Crim.App.1988), *perm. to appeal denied*, (Tenn.), *cert. denied*, 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed.2d 163 (1989), the post-conviction court ruled that "Tenn.Code Ann. § 40–14–407(b) does not authorize special support services in a post-conviction proceeding...."[12] The court added that "[t]he constitutional issue raised is whether joint trial counsel effectively represented petitioner according to constitutional standards. What trial counsel did or failed to do is of record."

In *Owens and Payne*, 908 S.W.2d at 928, the Tennessee Supreme Court held that Tenn.Code Ann. § 40–14–207(b) (1995 Supp.) applies to post-conviction capital cases.[13] The court further held that, in order to obtain an *ex parte* hearing, a post-conviction petitioner must comply with the procedural guidelines set forth in Tenn.Sup.Ct. Rule 13(2)(B)(10). *Id.* Moreover, at the

hearing, "a petitioner must demonstrate by specific factual proof that the services of an expert or an investigator are necessary to establish a ground for post-conviction relief, and that the petitioner is unable to establish that ground for post-conviction relief by other available evidence." *Id.* Thus, "[t]he trial court should grant the motion if ... the petitioner demonstrates that investigative or expert services are necessary to ensure the *protection of the petitioner's constitutional rights.*" *Id.* (emphasis added). In other words, within the post-conviction context, the support services sought must implicate a constitutional right.

In the case before us, the appellant seeks support services to ensure the protection of his Sixth Amendment right to the effective assistance of counsel. However, based upon the record before us, we have already determined that the appellant's claim of ineffectiveness is without merit. We agree with the post-conviction court's judgment that the record is adequate to the task. This issue is without merit.

## MOTION TO RECUSE

The appellant contends that the post-conviction judge abused his discretion in failing to recuse himself from these proceedings because (1) the judge, at the time of his designation, was seeking the office of United States Senator, (2) the judge was a material witness with respect to the issues raised in the post-conviction proceeding, and (3) the impartiality of the trial judge might reasonably be questioned.

First, Tenn.Sup.Ct.Rule 10, Cannon 7(A)(3), in pertinent part, requires a judge to resign his office "when he becomes a candidate in a party primary or in a general election for a non-judicial office." The appellant correctly argues that it would be inappropriate for one seeking national office to

---

**12.** The post-conviction court's ruling preceded the Tennessee Supreme Court's decision in the consolidated cases of *Owens and Payne v. State*, 908 S.W.2d 923, 928 (Tenn.1995), which expressly overruled the dicta of *Teague*.

**13.** Tenn.Code Ann. § 40–14–207(b) provides in pertinent part:

[I]n capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, such court in an *ex parte* hearing may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the *constitutional rights of the defendant are properly protected ...*
(Emphasis added).

preside over a highly publicized death penalty post-conviction proceeding. However, absent the bald allegation by the appellant, nothing in the record suggests that the post-conviction judge was a candidate in the primary or general election for the position of United States Senator at the time of his designation as a special judge. Rather, the record contains the following facts relevant to this issue: On August 31, 1993, the judge resigned his office as Circuit Judge for the Fourth Judicial District of Tennessee in anticipation of his candidacy for the United States Senate. However, the judge subsequently reconsidered his position and chose not to seek elective office. Therefore, on September 29, 1993, when the Supreme Court of Tennessee designated him as a special judge to preside over the post-conviction proceeding in this case, the judge was not running for the United States Senate. This contention is without merit.

The appellant also alleges that the trial judge had personal knowledge of disputed facts relevant to issues raised at the post-conviction proceeding. Specifically, the appellant contends that the trial judge was aware of the following facts: the significance of Vastrick's and Jones' testimony concerning the Maggie Valley letter; when defense counsel became aware that Vastrick and Jones would testify; whether and when defense counsel were led to believe that the State was no longer seeking handwriting exemplars from the appellant; and whether the appellant was advised of the consequences of his refusal to provide additional exemplars.

A motion to recuse is addressed to the sound discretion of the trial court. *State v. Parton*, 817 S.W.2d 28, 30 (Tenn. Crim.App.1991). Generally, "[w]hen a trial judge has no doubt of his ability to preside fairly over the matters presented, there is no need to grant a motion for recusal." *Johnson v. State*, No. 83–241–III, 1988 WL 3632 (Tenn.Crim.App. at Nashville, January 20, 1988), *aff'd in part, rev'd in part*, 797 S.W.2d 578 (Tenn.1990). However, the standard is ultimately an objective one. Thus, recusal is warranted "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a

reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn.Crim.App.1994). The standard of review on appeal is whether the trial court abused its discretion by denying the motion. *State v. Cash*, 867 S.W.2d 741, 749 (Tenn. Crim.App.1993).

Tenn.Sup.Ct.Rule 10, Cannon 3(C) provides, "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." However, prior knowledge of facts about the case is not sufficient in and of itself to require disqualification. *Alley*, 882 S.W.2d at 822. Moreover, we note that a judge is in no way disqualified merely because he has participated in other legal proceedings against the same person. *King v. State*, 216 Tenn. 215, 391 S.W.2d 637, 642 (1965). *See also State v. Demodica*, No. 99, 1990 WL 21233 (Tenn.Crim.App. at Knoxville), *perm. to appeal denied*, (Tenn.1990). The supreme court has observed that "[j]udicial knowledge upon which a decision may be based is . . . the cognizance of certain facts the judge becomes aware of by virtue of the legal procedures in which he plays a neutral role." *Vaughn v. Shelby Williams of Tennessee, Inc.*, 813 S.W.2d 132, 133 (Tenn. 1991). The court of appeals in *Embry v. Chimenti*, No. 02A01–9305–CV–00116, 1994 WL 81221 (Tenn.App. March 15, 1994), citing *Vaughn*, distinguished between a judge's knowledge obtained by virtue of his position in an earlier, related proceeding and knowledge obtained outside the courtroom. Thus, to disqualify, prejudice " 'must stem from an *extrajudicial* source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case.' " *Alley*, 882 S.W.2d at 821 (citation omitted) (emphasis added).

Accordingly, pursuant to Tenn.Code Ann. § 40–30–103 (1994 Supp.), the judge who presided at the trial in which a conviction occurred is permitted, although not required, to preside over post-conviction proceedings when the competency of trial

counsel has been challenged by the appellant. This practice is pervasive. Indeed, in this case, upon request of the Supreme Court, the trial judge suspended his retirement in order to preside over the post-conviction proceedings.[14] As suggested by the State, to require recusal whenever a trial judge in a post-conviction proceeding has knowledge of disputed facts would wreak havoc in the criminal justice system.

██ It is true that a trial judge cannot both preside at a post-conviction proceeding and serve as a witness in that proceeding. *See* Tenn.R.Evid. 605; Cohen, Paine, and Sheppeard, *Tennessee Law of Evidence* (1990) § 605.1, pp. 247–248. However, having reviewed the record of the post-conviction proceedings, we conclude that the judge was not a significant source of information at the hearing, nor was the judge's decision ultimately influenced by that information. *Vaughn*, 813 S.W.2d at 134. Moreover, the record reflects that other witnesses were available to address the factual issues.

██ The appellant nevertheless complains that the trial judge's conduct of the post-conviction hearing, including his findings at the conclusion of the hearing, render his impartiality suspect. Initially, we note that adverse rulings by a court are not usually sufficient grounds to establish bias. *Alley*, 882 S.W.2d at 821. Moreover, "[t]he issue to be determined is not the propriety of the judicial conduct of the judge, but whether he committed an error which resulted in an unjust disposition...." *State v. Hawk*, 688 S.W.2d 467, 472 (Tenn.Crim.App.1985). We conclude that the judge's remarks and actions at the post-conviction hearing, albeit on occasion ill-advised, did not diminish the overall fairness of the proceeding, even applying the heightened standards of due process applicable in a capital case.[15] *See State v. Cazes*, 875 S.W.2d 253, 260 (Tenn.1994), *cert. denied*, 513 U.S. 1086, 115 S.Ct. 743, 130

L.Ed.2d 644 (1995). This issue is without merit.

## MOTION FOR CONTINUANCE

On November 9, 1993, the appellant filed a motion to continue the post-conviction evidentiary hearing. In support of his motion, the appellant alleged that he had not completed the investigation of his claims. On November 23, 1993, the post-conviction court denied the appellant's motion.

On November 29, 1993, at the evidentiary hearing, the appellant renewed his motion for a continuance and made an offer of proof in the form of Robert Steele's testimony. Steele is an investigator and litigation specialist with the Capital Case Resource Center. As mentioned earlier, Steele testified that he had been coordinating the penalty phase investigation of this case since August, and that he had contacted 140 individuals in order to collect records relating to the appellant. He stated that he had received 23 responses, including the report from the Western Carolina Center. Steele stated that it would take approximately 6 to 9 months to complete the penalty phase investigation of this case. The court denied the renewed motion.

Additionally, on the morning of the post-conviction hearing, the appellant amended his petition, alleging in part that the grand and petit juries in this case were not representative of the community. The defense argued that they would require at least sixty days in order to investigate the systematic exclusion of certain cognizable groups from the Sevier County jury system. This motion for a continuance was also denied.

██ It is well established that the decision whether to grant a continuance "rests within the discretion of the trial court." *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn.Crim.App.1991), *perm. to appeal denied*, (Tenn.1992). Moreover, the denial of a continuance will not be disturbed "unless it

14. At the post-conviction proceeding, the trial judge remarked, "The Judges asked me to hear it. I thought well we don't want anything for someone to grasp at on these proceedings ... let us do it by the numbers, ... and so the supreme court appointed me to hear it...."

15. The appellant also challenged the impartiality of this judge on direct appeal. The Tennessee Supreme Court found, "An examination of the entire record establishes that the trial court did not conduct the trial in a manner showing bias in favor of the State.", *Harris*, 839 S.W.2d at 66.

appears upon the face of the record that the trial judge abused his discretion and prejudice enured to the accused as a direct result of the trial judge's ruling." *State v. Dykes,* 803 S.W.2d 250, 257 (Tenn.Crim.App.1990). Additionally, in order to trigger post-conviction relief, the denial of a motion for continuance must implicate a constitutional right. Thus, the habeas petitioner "must demonstrate, first, that the . . . court abused its discretion and, second, that its action rendered the [proceeding] fundamentally unfair." *Conner v. Bowen,* 842 F.2d 279, 283 (11th Cir.), *cert. denied,* 488 U.S. 840, 109 S.Ct. 107, 102 L.Ed.2d 82, *and cert. denied,* 488 U.S. 864, 109 S.Ct. 164, 102 L.Ed.2d 135 (1988). We note that the grant or refusal of a continuance "rarely reaches constitutional proportions." *Knighton,* 740 F.2d at 1351.

 . We conclude that the trial court did not abuse his discretion. The proof indicates that the Capital Case Resource Center first became involved in this case when its attorney, Brock Mehler, filed a petition for writ of certiorari to the United States Supreme Court. In February, 1993, the Supreme Court denied the petition. In June, 1993, the Capital Case Resource Center was appointed to represent the appellant in his post-conviction proceedings. At this time, post-conviction counsel withdrew the record, and, in July, 1993, reviewed the record. On August 10, 1993, counsel filed a petition. As previously noted, the evidentiary hearing was held on November 29, 1993. Thus, the appellant's counsel had access to the records in this case for at least five months prior to the post-conviction hearing, including three months following the filing of the appellant's petition.

Moreover, the appellant has failed to identify any prejudice affecting his conviction or sentence. It is undisputed that a continuance may be granted for the purpose of securing the presence of identifiable witnesses if the witnesses' testimony is material and admissible. However, in this case, the appellant sought a continuance in order to gather information which, at the time of the motion, was largely unknown and of entirely speculative value.

 Thus, while we do not wish to douse the flames of post-conviction counsel's zeal-

ous representation, a continuance of six to nine months under the facts presented is not warranted. Moreover, for the reasons already discussed, the post-conviction court's denial of the appellant's motions does not implicate his due process rights. This issue is without merit.

## PREMEDITATION AND DELIBERATION

The appellant next contends that, in light of the Supreme Court's decision in *State v. Brown,* 836 S.W.2d 530, 534 (Tenn.1992), the evidence introduced at trial was insufficient to support premeditation and deliberation. Moreover, the appellant argues that, pursuant to *Brown,* the trial court's instruction to the jury, that premeditation may be formed in an instant, was improper.

In *Brown,* our supreme court held that "it is prudent to abandon an instruction that tells the jury that 'premeditation may be formed in an instant.'" *Id.* at 543. However, the *Brown* case was decided on June 1, 1992. The appellant's trial occurred in 1988. We have held that *Brown* is not to be applied retroactively. *Lofton v. State,* 898 S.W.2d 246, 249–250 (Tenn.Crim.App.1994), *perm. to appeal denied,* (Tenn.1995); *Peters v. State,* No. 03C01–9409–CR–00331, 1995 WL 632346 (Tenn.Crim.App. at Knoxville, October 30, 1995). Moreover, the supreme court's holding in *Brown* does not implicate a constitutional right or new rule of law. Accordingly, this court has repeatedly held that *Brown* may not be used as a basis for relief within the post-conviction context. *See, e.g., Lofton,* 898 S.W.2d at 249–250; *Peters,* No. 03C01–9409–CR–00331; *State v. Slate,* No. 03C01–9201–CR–00014, 1994 WL 228751 (Tenn. Crim.App. at Knoxville, May 23, 1994).

 This court in *Slate,* No. 03C01–9201–CR–00014, held that sufficiency of the evidence, generally, may implicate the due process rights of the appellant and is therefore a cognizable claim in post-conviction proceedings pursuant to Tenn.Code Ann. § 40–30–105 (1990). However, issues that have been previously determined on direct appeal cannot support a petition for post-conviction relief. Tenn.Code Ann. § 40–30–111, –112

(1990). *See also Harvey v. State,* 749 S.W.2d 478, 479 (Tenn.Crim.App.1987); *Gribble v. State,* No. 02C01–9303–CC–00039, 1995 WL 46379 (Tenn.Crim.App. at Jackson), *perm. to appeal denied,* (Tenn.1995); *Randolph v. State,* No. 03C01–9309–CR–00309, 1994 WL 421325 (Tenn.Crim.App. at Knoxville), *perm. to appeal denied,* (Tenn.1994), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1699, 115 S.Ct. 1699 (1995).

The appellant challenged the sufficiency of the evidence on direct appeal. *Harris,* 839 S.W.2d at 75–76. As noted earlier, the Supreme Court found that "[s]ince the overwhelming evidence supported the verdict of the jury, the judgment of conviction must be affirmed." *Id.* at 76. The appellant contends that, in evaluating the sufficiency of the evidence, the supreme court concentrated upon the evidence implicating the appellant in the crime and did not directly address the issues of premeditation and deliberation. The appellant cites this court's decision in *Slate,* No. 03C01–9201–CR–00014, in support of his argument. However, on direct appeal in *Slate,* the appellate court, without discussing the merits, held that the issue of sufficiency of the evidence was entirely waived. Therefore, the post-conviction appellate court found that the issue had not been previously determined. In contrast, in the instant case, the supreme court addressed the merits of the appellant's challenge to the sufficiency of the evidence. Thus, this issue has been previously determined and is not subject to review in this proceeding.

### *MIDDLEBROOKS ISSUE*

The appellant also contends that because he was convicted of felony murder, the supreme court's decision in *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), *cert. dismissed,* 510 U.S. 124, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993), should be applied to invalidate the aggravating circumstance of felony murder. The record reveals that the jury found the appellant guilty of both felony

murder and premeditated first degree murder, as to each victim.[16] Prior to the sentencing phase of the trial, the trial court "merged" the felony murder and premeditated murder verdicts, in effect dismissing the felony murder verdicts.[17]

In *Middlebrooks,* the Tennessee Supreme Court held that the state is precluded from using felony murder as an aggravating circumstance when the underlying conviction is felony murder. *Id.* at 346. In so holding, the court stated the following:

> [W]hen the defendant is convicted of first-degree murder solely on the basis of felony murder, the aggravating circumstance set out in Tenn.Code Ann. § 39–13–203(i)(7) (1982) and 39–13–204(i)(7) (1991), does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U.S. Constitution and Article I, § 16 of the Tennessee Constitution because it duplicates the elements of the offense.

*Id.*

As the state correctly asserts, the appellant was not convicted "solely on the basis of felony murder." The jury returned guilty verdicts on counts of both premeditated and felony murder. This issue is without merit.

### *SEQUENTIAL JURY INSTRUCTIONS*

The appellant next contends that "the jury's deliberative process was unfairly skewed by the Court's instruction." At the conclusion of the guilt phase of the trial, the judge instructed the jury on the elements of first degree murder. The judge then instructed the jury that it could only consider the lesser included offense of second degree murder if it first acquitted the appellant of the greater offense.

This court has repeatedly upheld the giving of so-called "acquittal first" instructions. *See State v. Raines,* 882 S.W.2d 376, 381–382 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1994); *State v. McPherson,* 882 S.W.2d

---

16. The appellant was indicted on two counts of premeditated first degree murder and two counts of felony murder. All four counts were submitted to the jury.

17. Similarly, in *State v. Hurley,* 876 S.W.2d 57, 69–70 (Tenn.1993), where the defendant was convicted of both felony murder and premeditated first degree murder of one victim, the supreme court dismissed the felony murder count.

365, 375–376 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1994); *State v. Rutherford,* 876 S.W.2d 118, 119–120 (Tenn.Crim. App.1993), *perm. to appeal denied,* (Tenn. 1994); *State v. Beckham,* No. 02C01–9406– CR–00107, 1996 WL 389321 (Tenn.Crim.App. at Jackson, September 27, 1995). Accordingly, this issue is without merit.

### THE TENNESSEE DEATH PENALTY STATUTE

The appellant raises numerous constitutional challenges to Tennessee's death penalty statute. Although he acknowledges that the Tennessee Supreme Court has rejected each of these arguments in the past, he nevertheless raises them in order to preserve the issues for later review by the federal appellate courts.

The appellant first contends that Tennessee's death penalty statute fails to meaningfully narrow the class of death eligible defendants. Specifically, the appellant maintains that, in combination, aggravating circumstances (i)(2),[18] (5),[19] (6),[20] and (7)[21] apply to a majority of the homicides committed in Tennessee. He submits that, if he possessed the resources to investigate and obtain statistical evidence, he could show that "it is the exception rather than the rule that a homicide does not involve a collateral felony (i)(7) and, consequently, the killing of the victim/witness to that felony (i)(6), or does not involve the infliction of severe mental or physical pain (i)(5), or that the person who commits the homicide does not have a prior conviction for assault or any felony 'whose statutory elements involve the use of violence to the person' (i)(2)." This argument was rejected by this court in *State v. Odom,* No.

02C01–9305–CR–00080, 1994 WL 568433 (Tenn.Crim.App. at Jackson, October 19, 1994), *perm. to appeal granted,* (Tenn.1995). *See generally State v. Smith,* 868 S.W.2d 561, 582 (Tenn.1993), *cert. denied,* 513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994); *State v. Cauthern,* 778 S.W.2d 39, 47 (Tenn.1989), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990). This issue has no merit.

The appellant also claims that the (i)(5) aggravating circumstance is vague and overbroad. Again, our supreme court has held that this statutory aggravating circumstance is constitutional. *See State v. Black,* 815 S.W.2d 166, 181–182 (Tenn.1991). This issue is without merit.

The appellant contends that the (i)(6) aggravating circumstance has been construed and applied in such a manner as to be duplicative of the (i)(7) aggravating circumstance. We conclude, however, that this issue need not be addressed, since the jury did not find that the (i)(6) aggravating circumstance is applicable in this case.

The following arguments raised by the appellant were rejected in *State v. Smith,* 857 S.W.2d 1 (Tenn.), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993), *and cert. denied,* 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994):

(1) the statute is unconstitutional because the death penalty has been imposed in a discriminatory manner based upon economics, race, geography, and gender, *Id.* at 23;

(2) the lack of uniform procedures mandating individual sequestered voir dire during jury selection renders the imposi-

---

**18.** Tenn.Code Ann. § 39–2–203(i)(2) (1982) sets forth the aggravating circumstance that "[t]he defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person."

**19.** Tenn.Code Ann. § 39–2–203(i)(5) (1982) sets forth the aggravating factor that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind."

**20.** Tenn.Code Ann. § 39–2–203(i)(6) (1982) sets forth the aggravating factor that "[t]he murder was committed for the purpose of avoiding, in-

terfering with, or preventing the lawful arrest or prosecution of the defendant or another."

**21.** Tenn.Code Ann. § 39–2–203(i)(7) (1982) sets forth the aggravating factor that "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb."

tion of the death penalty arbitrary and capricious, *Id.* at 20;

(3) the death penalty statute is unconstitutional because it limits the consideration of mitigating evidence by requiring the jury to unanimously agree on a life sentence, *Id.* at 18; and

(4) the death penalty statute is unconstitutional because the jury is not required to make the ultimate determination that the death penalty is appropriate, *Id.* at 22.

The following arguments raised by the appellant were rejected by the supreme court in *State v. Caughron,* 855 S.W.2d 526, 542 (Tenn.), *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993):

(1) by excluding jurors who have scruples against the death penalty, the jury selection process skews the make-up of the jury to make it prosecution-prone and thereby violates the defendant's constitutional rights; and

(2) the death penalty is arbitrarily and capriciously imposed because the State has the right of final closing argument at the penalty phase.

The following arguments raised by the appellant were rejected by the supreme court in *State v. Brimmer,* 876 S.W.2d 75, 86–87 (Tenn.), *cert. denied,* 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994):

(1) the death penalty is imposed in an arbitrary and capricious manner because the defendant is not allowed to address issues such as parole eligibility, cost of incarceration versus cost of execution, deterrence, and method of execution;

(2) the death sentence is imposed in an arbitrary and capricious manner because the jury is not instructed as to the effect of a non-unanimous verdict;

(3) the death penalty is arbitrarily and capriciously imposed because the prosecutor is allowed discretion in deciding whether to seek the death penalty; and

(4) the death penalty statute is unconstitutional because there is a reasonable likelihood that the Tennessee Pattern Jury Instructions lead the jurors to believe that they are required to unanimously agree as to the existence of mitigating circumstances.

The appellant also argues that electrocution is a cruel and unusual punishment, thereby violating the appellant's constitutional rights. This argument was specifically rejected in *Black,* 815 S.W.2d at 178–179.

Finally, the appellant argues that the appellate review process in Tennessee is constitutionally inadequate. Specifically, he argues that appellate review in Tennessee is not meaningful for the following reasons: there is no uniform, state-wide procedure for collecting and evaluating data concerning the disposition of homicide cases; the cases of defendants convicted of some degree of homicide less than first degree murder and/or the cases of defendants who received a sentence of less than life imprisonment are not reported to the supreme court; the information collected by the trial judges in the Tenn.Sup.Ct.Rule 12 form is inadequate; the jury verdict form mandated by Tenn.Code Ann. § 39–2–203(f) (1982) did not require the jury to report mitigating circumstances and thereby renders appellate review of these circumstances impossible; and no published standard for review of proportionality is available. In short, the appellant asserts that "there is no meaningful body of collected data to which the defendant can refer and no standard upon which the defendant can rely to plead his case." This argument was specifically rejected by this court in *Odom,* No. 02C01–9305–CR–00080. *See also Cazes,* 875 S.W.2d at 270–271.

### CONCLUSION

The record fully supports the post-conviction court's findings and conclusions. The appellant has clearly not met his burden of proof. We conclude that the petition for post-conviction relief was properly denied. For the reasons we have stated, the judgment of the post-conviction court is affirmed.

SUMMERS and BARKER, JJ., concur.

### ORDER DENYING PETITION TO REHEAR

The appellant has filed a Petition to Rehear requesting that this court reconsider

our opinion holding that the appellant received the effective assistance of counsel at the guilt and sentencing phases of his trial. He contends that the court's opinion incorrectly states the material facts established by the evidence and set forth in the record, is in conflict with prior decisions, and overlooks material facts and propositions of law. Tenn. R.App.P. 39(a)(1), (2), and (3). Having thoroughly re-examined the record, we conclude that the issue of ineffective assistance of counsel has been adequately considered. Accordingly, the appellant's Petition to Rehear is denied. Nevertheless, recognizing the heightened standard of scrutiny applicable to the review of a sentence of death and to insure that our conclusions are sufficiently reflected on the record, we elect to address certain points raised by the appellant in his Petition. *See* Tenn.Code Ann. § 39–13–206(c)(1)(B), (c)(1)(C) (1994 Supp.).

 First, the appellant contests this court's citation to *Dees v. Caspiri,* 904 F.2d 452, 455 (8th Cir.), *cert. denied,* 498 U.S. 970, 111 S.Ct. 436, 112 L.Ed.2d 419 (1990), in support of the proposition that trial counsel's failure to further investigate the authorship of the Maggie Valley letter was a reasonable strategic decision. We acknowledge, as correctly pointed out by the appellant, that under Tennessee law trial counsel would *not* have been required to disclose to the State any unfavorable opinion by an expert whom he did not intend to call at trial or whose report he did not intend to introduce at trial. Tenn.R.Crim.P. 16(b)(1)(B) and (b)(2). *See also State v. Nichols,* 877 S.W.2d 722, 729–730 (Tenn.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *State v. Vilvarajah,* 735 S.W.2d 837, 839 (Tenn. Crim.App.1987); *State v. Bell,* 690 S.W.2d 879, 883 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1985). However, the appellant incorrectly infers that our evaluation of trial counsel's investigation of the Maggie Valley Letter relied upon *Dees,* 904 F.2d at 452.

Initially, we noted in our opinion that the appellant, by refusing to submit additional handwriting samples to the State, rejected an opportunity to exonerate himself as the author of the Maggie Valley letter. Moreover, the record does not support the appellant's

position that defense counsel failed to further explore a November 20, 1987, report by document examiner James Kelly, in which Kelly indicated that "[c]omparison of the writing of Rufus Edward Doby with the writing in [the Maggie Valley letter] discloses similarities, but there are not enough for a positive identification." Kelly suggested in his report that the original copy of the Maggie Valley letter be submitted, along with additional writing samples from Doby.

For the purpose of clarification, we will outline the events concerning defense counsel's investigation of the Maggie Valley letter, as reflected in the record. Defense counsel received a copy of the Maggie Valley letter on February 2, 1988. They received samples of the appellant's handwriting on February 26, 1988. On or about February 29, 1988, defense counsel Charles Sexton communicated with Kelly. Kelly apparently informed Sexton that he had eliminated codefendants Doby, Pelley, and DeModica as the author of the Maggie Valley letter. Defense counsel received Kelly's report on approximately March 11, 1988. On the same day, defense counsel also received reports completed by the State's document examiner, Thomas Vastrick, which indicated that neither Pelley, DeModica, nor Doby had written the Maggie Valley letter. Vastrick's reports also reflected a possibility that the appellant had written the letter, but Vastrick required additional handwriting samples. Notes recovered from the file of defense counsel William Goddard, dated March 15, 1988, indicated that Sexton and Goddard contemplated consulting another handwriting expert, Buster Brown. At the post-conviction hearing, Sexton testified that defense counsel spoke with Mr. Brown but did not request an analysis. On April 5, 1988, the State submitted a motion for additional samples of the appellant's handwriting. Defense Counsel submitted a motion requesting a certificate of need which would allow the appellant to subpoena James Kelly for trial. On April 7, 1988, defense counsel received a report from Thomas Vastrick indicating that he was still unable to establish that the appellant was the author of the Maggie Valley letter. On April 11, 1988, defense counsel discussed with the court their efforts to obtain an opinion from

Kelly that Doby, rather than the appellant, was the author of the letter. They indicated that they would like to send the original Maggie Valley letter and additional samples of Doby's handwriting to Kelly. On April 13, 1988, the court ordered the State to provide the requested materials to defense counsel, with the exception of the original Maggie Valley letter. However, the court indicated that, should the original letter prove indispensable, the State and defense counsel might, on their own, arrange to send the letter to Kelly, or defense counsel could submit additional motions to the court. Sexton testified at the post-conviction hearing that he could not recall specifically what happened after this hearing with respect to Mr. Kelly. However, he did state, "I believe at some point, in time, additional information [was] obtained, and I do believe that in the course of the proceedings those were eventually provided to Mr. Kelly." He also testified that defense counsel did engage in further communication with Kelly. However, he could not recall the outcome of those communications. Sexton also stated that defense counsel spoke with Vastrick and determined that Vastrick was unable to testify that the appellant wrote the Maggie Valley letter.

Thus, the record does not reveal whether or not Kelly was ever provided with the original Maggie Valley letter, additional samples of Doby's handwriting, or samples of the appellant's handwriting. As to the "eleventh-hour request for an expert on the eve of trial," this request was not necessarily a reflection of "haphazard" investigation, but rather a reaction to the "eleventh-hour" production by the State of an additional witness prepared to testify that the handwriting in the Maggie Valley letter was that of the appellant. The burden is on the appellant at a post-conviction proceeding to prove the allegations in his petition by a preponderance of the evidence. *McBee v. State*, 655 S.W.2d 191, 195 (Tenn.Crim.App.1983). *See also State v. Buford*, 666 S.W.2d 473, 475 (Tenn. Crim.App.1983), *perm. to appeal denied*, (Tenn.1984). While admittedly the issue of ineffective assistance of counsel in this case is a close one, we conclude that the appellant simply did not meet his burden of proof.

With respect to counsel's investigation at the penalty phase of the trial, we acknowledge that this court in *Cooper v. State*, 847 S.W.2d 521, 529 (Tenn.Crim.App.1992), indicated that there is a greater burden placed on defense counsel to investigate possible mitigating evidence at the penalty phase of a capital trial. However, in *Cooper*, 847 S.W.2d at 525–526, the defendant's sister told defense counsel about "the defendant's depression, attempted suicide, and his seeing [a clinical psychologist] ninety days before the killing.... she told the attorney about the involuntary commitment order which she had obtained for [the defendant] on the day of the killing." This court found that the attorney's failure to further investigate the defendant's psychological background and condition was ineffective assistance of counsel. Similarly, in *Adkins v. State*, 911 S.W.2d 334, 355 (Tenn.Crim.App.1994), *perm. to appeal dismissed*, (Tenn.1995), defense counsel learned from family members and friends that the defendant's father was an alcoholic who had abused the appellant. This court found that defense counsel's decision to forgo further investigation of mitigating evidence and his failure to present mitigating evidence were ineffective assistance of counsel. In *Bell v. State*, No. 03C01–9210–CR–00364, 1995 WL 113420 (Tenn.Crim.App. at Knoxville), *perm. to appeal denied*, (Tenn.1995), this court found that counsel's investigation and preparation for the penalty phase of the trial, including counsel's failure to request a psychological examination of the defendant, constituted ineffective assistance of counsel. As in the instant case, counsel failed to obtain juvenile records that arguably revealed the defendant's low I.Q. However, in *Bell*, No. 03C01–9210–CR–00364, counsel personally believed that the defendant was suffering psychological difficulties. Moreover, at the post-conviction hearing, counsel conceded that less preparation was done for the penalty phase of the trial than for the guilt/innocence phase. Counsel described the investigative effort as "not overwhelming."

In the instant case, the record does not support the appellant's assertion that defense counsel only began to prepare for the sentencing phase the weekend before trial. Rather, Sexton testified at the post-convic-

tion hearing that, prior to that weekend, he "had looked at that, and worked on that...." As stated in our opinion, defense counsel interviewed the appellant on many occasions. During an early interview, counsel used an eight to ten page form to gather background information from the appellant. Defense counsel contacted the appellant's mother on several occasions. They also attempted to contact other individuals named by the appellant, largely without success. Sexton observed that "it was hard to find somebody that would take an interest in this man...." Sexton also testified that he could not recall being informed of either an abusive family situation or psychological or mental difficulties. There is no evidence in the record that defense counsel was aware of any psychological or mental difficulties. Indeed, Sexton testified that the appellant did not appear to suffer any "mental deficiencies."[1] The appellant testified at the sentencing phase that his poor performance in school resulted from a lack of motivation, rather than a lack of intelligence. With respect to medication administered to the appellant while he was in jail awaiting trial, we would simply note that in *Elledge v. Dugger*, 823 F.2d 1439, 1444–1445 n. 10 (11th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988), the court found that trial counsel should have pursued the issue of the defendant's mental condition, upon learning that he was being treated with antipsychotic medications while in jail, because of trial counsel's personal conviction that the defendant was "crazy." In the instant case, Sexton testified that, at no time during the proceedings, did he feel that the appellant was suffering psychological difficulties.

The appellant also argues that the jury had no choice but to return a verdict of death. *Adkins*, 911 S.W.2d at 356. We disagree. During the penalty phase, defense counsel emphasized to the jury the appellant's limited education, the appellant's difficult relationship with his parents during his childhood, the fact that the appellant ran away from home at an early age, remaining doubt concerning the appellant's role in the murders, the fact that the appellant has two children, and testimony adduced during the guilt phase of the trial concerning various attempts by the appellant to "help[ ] people." Defense counsel and the appellant asked that the jury exercise mercy.

The appellant also suggests the presence of Eighth Amendment and Fourteenth Amendment claims stemming from the alleged errors of his trial counsel. This court acknowledges that the Supreme Court has held that it is a violation of the Eighth and Fourteenth Amendments for a state, by statute, or a judge to preclude a jury from considering mitigating evidence in a capital case. *See, e.g., Hitchcock v. Dugger*, 481 U.S. 393, 394, 107 S.Ct. 1821, 1822, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670–1671, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 111–114, 102 S.Ct. 869, 875–876, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–2965, 57 L.Ed.2d 973 (1978). However, the Supreme Court has consistently analyzed *counsel's* failure to present mitigating evidence against the standards of the Sixth Amendment. *See, e.g., Burger v. Kemp*, 483 U.S. 776, 788–795, 107 S.Ct. 3114, 3122–3126, 97 L.Ed.2d 638 (1987); *Strickland v. Washington*, 466 U.S. 668, 687–692, 698–699, 104 S.Ct. 2052, 2065–2066, 2070–2071, 80 L.Ed.2d 674 (1984).

■■■■ With respect to prejudice at the sentencing phase, under *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069, we must consider whether the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Thus, contrary to the appellant's assertion, in noting the brutal nature of the crimes involved, we in no way implied that the appellant's crimes are "unmitigatable." Moreover, in evaluating possible prejudice to the appel-

---

1. When counsel has no reason to know of a client's mental problems, the Sixth Amendment does not impose a general duty to explore the defendant's mental capacity. *See, e.g., Riley v. Snyder*, 840 F.Supp. 1012, 1027 (D.Del.1993) (citing *United States ex rel. Rivera v. Franzen*, 794 F.2d 314 (7th Cir.), *cert. denied*, 479 U.S. 991, 107 S.Ct. 588, 93 L.Ed.2d 590 (1986), and *Clanton v. Bair*, 826 F.2d 1354 (4th Cir.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988)).

lant, our review is limited to those mitigating factors reflected in the record. Therefore, our observation concerning the mitigating evidence arguably available to the appellant was only intended to describe the evidence reflected in the record.[2] In conclusion, we agree that it is neither this court's right nor prerogative to impose any limitation on mitigating evidence that may be considered by the jury in a capital case. *Hitchcock,* 481 U.S. at 394, 107 S.Ct. at 1822; *Skipper,* 476 U.S. at 4, 106 S.Ct. at 1670–1671; *Eddings,* 455 U.S. at 111–114, 102 S.Ct. at 875–876; *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964–2965.

For the reasons stated above, the appellant's Petition to Rehear is denied.

2. Our consideration of possible prejudice pursuant to *Strickland* has encompassed the appellant's background, possible mental difficulties, and other mitigating factors argued by defense counsel during the penalty phase.