IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 24, 2001 Session

## WILLIAM SINGLETON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Claiborne County**
**No. 10722      Bobby H. Capers, Judge**

**No. E2000-02820-CCA-R3-PC**
**June 28, 2001**

On December 16, 1993, William Singleton, the Defendant and Appellant, was convicted by a Claiborne County jury of first-degree murder. This Court affirmed the Defendant's conviction following direct appeal. Subsequently, the Defendant filed a petition for post-conviction relief alleging, *inter alia* that he was denied the effective assistance of counsel at trial. Following a hearing, the trial court dismissed the petition. The Defendant appeals here, arguing that the trial court erroneously dismissed the petition. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Michael G. Hatmaker, Jacksboro, Tennessee, for appellant, William Singleton.

Paul G. Summers, Attorney General & Reporter; Mark A. Fulks, Assistant Attorney General; William Paul Phillips, District Attorney General; and Michael O. Ripley, Assistant District Attorney, for appellee State of Tennessee.

**OPINION**

**Factual Background**

The facts underlying the Defendant's conviction were summarized by this Court following

direct appeal as follows:

The victim, James Keck, was last seen by his family around 12:00 or 12:30 a.m. on January 13, 1993. On this occasion, the victim was seen by his brother in the company of the appellant outside a convenience store in Tazewell. Upon Keck's

failure to return home, his wife reported him missing on the evening of January 13th. The victim's vehicle was later found abandoned and burned.

On January 15th, Criminal Investigator Kelly Anders of the Claiborne County Sheriff's Department contacted the appellant by telephone concerning a search for the victim on the Singleton farm. On this occasion, the appellant orally consented to a search of his farm. On Saturday morning, January 16th, Investigator Anders contacted the appellant by phone to verify that the appellant was home that morning in order that he might obtain the appellant's signature on a consent to search form. In a discussion of the search, the appellant again stated that no written consent was necessary but that he would be at home upon Investigator Anders arrival. Later that morning, Investigator Anders arrived at the appellant's farm with a search party of between forty and sixty people, consisting mainly of citizen volunteers. Anders again discussed with the appellant permission to search the premises and also asked if the appellant wanted to join the search party. The appellant again agreed to the search but declined to join the search party, explaining that he had plans to transport his family to a church meeting that morning. He did, however, sign a written authorization permitting a "complete search" of his premises. The authorization apprised the appellant of his right to refuse consent and contained no expressed limitations on the scope of the search. After signing the consent form, the appellant left with his family.

During the course of the search, Anders discovered a freezer secured by a chain and a padlock in the appellant's barn. The freezer was concealed under bales of hay. Anders did not open the freezer immediately. Instead, he decided to wait until the appellant returned home. After waiting more than four hours, Anders reconsidered and broke open the freezer's padlock with a hammer. Inside was found the frozen body of Jeff Keck wrapped in plastic and tape, and covered with tobacco, manure and dirt.

After discovering the body, Sheriff's personnel continued searching the barn. The search revealed other incriminating items including several rolls of tape and plastic wrap. Both the plastic and tape rolls were consistent with the materials used to wrap the victim's body.

Sheriff's personnel later obtained a search warrant for the appellant's residence. The subsequent search uncovered a key matching the lock on the freezer and several boxes of shell casings consistent with bullets recovered from the victim's head. Based on this information, the appellant was arrested and charged with first-degree murder.

The appellant later moved to suppress the evidence found in his barn on Fourth Amendment grounds. According to the appellant, his consent to search was neither voluntary nor did it extend to breaking the padlock on his freezer. On December 7, 1993, the trial court conducted a hearing on the matter.

During the suppression hearing, the State called Investigator Kelly Anders to testify. Anders stated that he requested verbal consent from the appellant twice before leading the search party to the appellant's home that Saturday. At the suppression hearing, Anders testified as follows:

Q: At that time when he--when he signed the written consent, or before he signed the written consent, did he talk to you about where you could search?

A: Yes, sir.

Q: Where did he say you could search?

A: He said that I could search anywhere, any place, anything on his property, that he wanted to help find Jeff, and if could be--if he was to be found out there, then to find him,--you can search my house, you can search everything on my property, just be careful when you go in the dotted area there, (referring to a map) the old homestead, he said--it is falling through and you could fall through the floor and get injured in there.

Q: Did he talk with you anything (sic) about the scope of that search, about where the search would be okay?

A: He made it quite clear to me that I could search anywhere on his property. Search anything. He even told me the boundaries of his property.

Anders testified that on the morning of the search the appellant behaved in an extremely cooperative manner. The appellant voiced no reservations about the search and seemed quite relaxed.

The defense presented evidence to establish the appellant's below average intelligence. A test given to the appellant in 1986 measured his I.Q. at 74. The evidence, on the other hand, also demonstrated that the appellant completed the eleventh grade and operated a tobacco farm for several years. At the time of the offense, the appellant was 28 years of age and was married with four children in the home.

Based on the evidence presented, the trial court denied the appellant's motion to suppress. In doing so, the court found that the appellant gave voluntary consent

to search, and found that the search did not exceed the scope of that consent. Thus, the evidence was deemed admissible for trial purposes.

At trial, Dr. Cleland Blake testified on the State's behalf. Dr. Blake is an independent forensic pathologist who performed the autopsy on the victim's body. Blake testified that he found three entry wounds in the frontal portion of the victim's head. Two of the wounds were located near the victim's right eye. The third was in the left temporal area. According to Blake, the third wound was fatal. Dr. Blake also stated that he recovered two damaged slugs from the victim's head. The bullets recovered were identified as .22 caliber. Dr. Blake also testified that because he found no powder burns on the victim's face, he believed that the muzzle of the murder weapon was at least twenty-four inches away when fired. Finally, Dr. Blake testified that the victim's body had been wrapped in plastic. A separate plastic bag covered the victim's head which contained blood that had drained from the head into the plastic.

The State also called witnesses who related information concerning the freezer in which the victim's body was found. The appellant's eleven year-old stepson testified that sometime in January 1993, he helped his father move the freezer from the front of the house to the barn. The appellant's sixteen year-old stepdaughter testified that she had witnessed the moving of the freezer to the barn, and that it had occurred in January, "somewhere around" the time that she had seen the victim at the appellant's residence. Finally, Mark Valandingham testified that he had noticed that the freezer had been moved when he came to the appellant's residence to borrow a chain on the afternoon of January 13th. All three witnesses testified that the freezer had been in front of the appellant's residence for a long period of time, at least a year, before it was moved to the barn.

At trial the State pursued a theory of a financial motive for the killing. The victim's wife testified that her husband had told her that a person named "Bill" had agreed to sell some tobacco that her husband had grown in excess of the amount he was allotted to sell under his "market card." Investigator Anders testified that the appellant told him that he and the victim had entered into an agreement to sell the victim's surplus tobacco at a tobacco sale on January 13th. According to the victim's wife, the appellant was to receive a twenty-five cents per-pound commission for selling the tobacco under his name. The wife testified that the victim and "Bill" had loaded the tobacco at the victim's farm and hauled it to the tobacco market on January 11th and 12th. Lawrence Russell, an employee of the Planter's Warehouse, an agent that buys and sells tobacco, testified that 4,012 pounds of tobacco was delivered to the Planter's Warehouse by the appellant on January 11 and 12. According to Russell's testimony, which was supported by documents from the sale, the tobacco delivered by the appellant sold on January 13th for $6817.93. Russell testified that at twenty-five cents per-pound, the appellant's commission would have been $1003. The victim's wife testified that on January 13th, the appellant called her and told her that he wanted to bring over the money from the sale. When asked where the victim

was, the appellant said that he had loaned the victim $3100, and that he had "gone to Virginia to buy some cattle."

The appellant also told Anders that on the night before the victim's disappearance, he had loaned the victim $3100 in advance of the proceeds from the tobacco sale. A bookkeeper for a John Deere dealership in Maynardsville testified that the appellant had a tractor payment of $4224.34 due on January 20, 1993. It was the State's theory that the appellant needed funds to make this tractor payment and, thus, fabricated the $3100 loan to the victim. The state argued that from the proceeds of $1003 commission and the $3100 fabricated loan the appellant could then meet his tractor payment which was due. The balance of the tobacco proceeds would be given to the victim's wife. With the victim dead, there would be no one to dispute the $3100 loan.

The defense offered no proof at trial. Based on the evidence presented, the jury convicted the appellant of first-degree murder.

State v. Singleton, No. 03C01-9406-CR-00221, 1994 WL 772861 at *1-*4 (Tenn. Crim. App. at Knoxville, March 19, 1995). This Court affirmed the Defendant's conviction. Id. at *8.

The Defendant filed a post-conviction petition, alleging ineffective assistance of counsel, prosecutorial misconduct and improper sentencing. At a hearing, the Defendant claimed that his trial attorneys repeatedly told him that he would be the last witness to testify, but on the last day of trial, he was told that he would not be allowed to testify. The Defendant claimed that he could have contradicted several of the State's witnesses' accounts of the incidents. He also claimed that his wife, Debbie Singleton, could have provided him with an alibi, but that trial counsel failed to call Mrs. Singleton to testify.

Mrs. Singleton testified that she remembered the evening that the killing supposedly took place. She claimed to remember that the Defendant had been hunting with the victim late into the night. The Defendant came to bed early the next morning and woke her up. She also said that, immediately after the Defendant woke her, she heard a truck that sounded like the victim's leaving.

Martha Yoakum, the District Public Defender and the Defendant's trial counsel, testified that she discussed the possibility of the Defendant testifying many times with the Defendant. She also testified that she could not remember the Defendant wanting his wife to testify. Ms. Yoakum remembered that the Defendant's wife was also indicted in this case at the time of trial, and Ms. Yoakum did not remember Mrs. Singleton telling her anything that would be helpful to the defense.

Tammy Clemmons, a criminal investigator with the Public Defender's Office, testified that she met with the Defendant several times. She specifically remembered Ms. Yoakum giving the Defendant the option of testifying, but the Defendant was not interested in testifying.

Following the hearing, the trial court found that the Defendant failed to prove that his trial counsel was ineffective. On appeal, the Defendant claims that the trial court erred in denying his ineffective assistance claim. We disagree.

## Effective Assistance of Counsel

In post-conviction proceedings, the petitioner bears the burden of proving the allegations raised in the petition by a preponderance of the evidence. Tidwell v. State, 922 S.W.2d 497, 500

(Tenn. 1996); Wade v. State, 914 S.W.2d 97, 101 (Tenn. Crim. App. 1995). Moreover, the trial court's findings of fact are conclusive on appeal unless the evidence preponderates against the judgment. Campbell v. State, 904 S.W.2d 594, 595-96 (Tenn. 1995); Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993).

The United States Supreme Court articulated a two-prong test for courts to employ in evaluating claims of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The Court began its analysis by noting that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. When challenging the effective assistance of counsel in a post-conviction proceeding, the petitioner bears the burden of establishing (1) the attorney's representation was deficient; and (2) the deficient performance resulted in prejudice so as to deprive the defendant of a fair trial. Id. at 687; Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). This Court is not required to consider the two prongs of Strickland in any particular order. Harris v. State, 947 S.W.2d 156, 163 (Tenn. Crim. App. 1996). Thus, "if the Appellant fails to establish one prong, a reviewing court need not consider the other." Id.

The test in Tennessee in determining whether counsel provided effective assistance at trial is whether counsel's performance was "within the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); see also Harris, 947 S.W.2d at 163. In order to demonstrate that counsel was deficient, the petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688; Harris, 947 S.W.2d at 163.

Under the prejudice prong of Strickland, the petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

The trial court was presented with conflicting evidence at the post-conviction hearing. First, although the Defendant claimed that his trial counsel prevented him from testifying, Ms. Clemmons contradicted that testimony. Furthermore, although the Defendant testified that his wife could have provided him with an alibi, Mrs. Singleton merely testified that her husband woke her and she heard a truck leave. Although she thought the truck sounded like the victim's truck, she could not positively identify the truck, and she did not see the victim. We conclude that this evidence would have failed to establish an alibi, and we agree with the trial court that the evidence presented at the post-conviction hearing was not "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In short, the trial court resolved the conflicting evidence in favor of the State, and we find that the evidence does not preponderate against the trial court's ruling that the Defendant was not denied the effective assistance of counsel. This issue is without merit.

Accordingly, the judgment of the trial court is AFFIRMED.

 

 

_____
JERRY L. SMITH, JUDGE