IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 15, 2005 Session

## STATE OF TENNESSEE v. AUGUSTINE JOHN LOPEZ, III

**Appeal from the Criminal Court for Davidson County**
**No. 2001-B-1192     Walter Kurtz, Judge**

_____

### No. M2003-02307-CCA-R3-CD - Filed June 28, 2005

_____

The Appellant, Augustine John Lopez, III, was convicted by a Davidson County jury of first degree
felony murder and theft of property over $1000 and subsequently received concurrent sentences of
life imprisonment and five years for the respective convictions.  On appeal, Lopez raises four issues
for our review: (1) whether the evidence is sufficient to support the convictions: (2) whether the trial
court erred in allowing testimony by a police officer concerning fingerprint evidence; (3) whether
the trial court erred in excluding the hearsay statements of a witness which indicated her possible
involvement in the murder; and (4) whether the trial court's sequential jury instruction was error.
After review of the record, the judgments of conviction are affirmed.


**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS
T. WOODALL, J., joined.

Nicholas D. Hare, Nashville, Tennessee, for the Appellant, Augustine John Lopez, III.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General;
Victor S. Johnson III, District Attorney General; Deborah Housel and Lisa Naylor, Assistant District
Attorneys General, for the Appellee, State of Tennessee.


## OPINION

### Factual Background

During the evening of November 29, 2000, the Appellant and a co-defendant, Fred Eugene
Thompson, Jr., entered the Nashville home of the victim, William Burton Craig, and brutally beat
him to death.  Additionally, a television, a VCR, clothing and other personal property of the victim,

and a 1997 Mercury Marquis, which belonged to the victim's mother, were stolen from the residence.

The fifty-three-year-old victim resided at 635 Harding Place in Nashville with his elderly mother, who owned the residence. However, due to health concerns, the victim's mother had moved from her residence approximately four weeks before the victim's death. In the weeks prior to the murder, Jan Crow[1] and the victim developed a close relationship, with Crow moving into the victim's home. During this period, the victim and Crow encountered problems with Crow's ex-husband, Clayton "Rabbit" Veach, whom Crow referred to as a "stalker." Three days prior to the murder, the victim threw Crow's clothes out of the home.

The testimony at trial established that the Appellant met Jan Crow for the first time on November 22, 2000, seven days prior to the murder of the victim. According to Crow, the Appellant identified himself to her as "Travis" when she met him at a convenience store in East Nashville where she had gone to purchase illicit drugs. She approached the Appellant, and he got into the victim's red Miata, which Crow was driving. The two then drove behind a building where Crow and the Appellant engaged in sex. Crow agreed to take the Appellant to the victim's home where she was staying to get money for the drugs. En route to Harding Place, the car became stuck on the railroad tracks, and the two were unable to move it. While they were gone for help, the car was hit by a train. The Appellant and Crow were then driven to 635 Harding Place by a friend. When the police arrived at the victim's home to get a report of the incident, the Appellant hid in the victim's bedroom. Crow returned to the scene of the accident with the officer, but the Appellant stayed with the victim.

During this time the Appellant used the victim's phone to call his girlfriend, Priscilla Floyd, at her mother's residence in Murfreesboro. Subsequently, the Appellant and the victim drove to Murfreesboro in the victim's mother's car and picked up Floyd before returning to the victim's home. Upon their arrival back at the victim's house, they found that Crow had also returned to the residence from the accident scene. The Appellant and Floyd watched television in the den, and the Appellant, after getting permission from the victim, went into the kitchen to get something to eat. He opened the cabinets searching for food, holding up several cans to see if Floyd wanted something to eat. While there, Floyd testified that she heard Crow talking to someone on the telephone, yelling and screaming at the other party. The victim also got on the phone, and threats were made. Eventually, the Appellant and Floyd went to sleep in the spare bedroom, and the next morning the victim took them home. Floyd never saw the victim again, but the Appellant called her sometime after Thanksgiving and told her that he had done something bad and might be going to jail for a long time.

On the evening of the homicide, the victim made a phone call to his long-time friend, Cheryl Flatt. While the two were engaged in conversation, someone came to the victim's door, whom he

---

[1]We note that Ms. Crow is also referred to in the transcript as Jan Crow Veach, Jannelle Crow, and Jannelle Crow Beech.

identified to Flatt as one of "Jan's friends." Flatt stated that the victim was "concerned" and asked her to call him back in ten minutes. Calling back, Flatt was able to get only a busy signal.

Also on this date, the victim spoke with another friend, Todd Irvine, and the two made plans to get together later in the evening. Because the victim had friends over at the time, Irvine was supposed to call the victim later to set up a time. Irvine tried calling several times that evening, but the line was continuously busy, despite call waiting on the line. Around 9:00 p.m., Irvine drove to the victim's residence at 635 Harding Place. He immediately noticed that the back gate and the sliding glass door to the house were open, which was highly unusual because the victim had a dog. Irvine entered the home, calling for the victim. He searched the house and found that the victim's bedroom was "demolished." Eventually, Irvine found the victim's badly beaten body on the kitchen floor with his hands and feet bound with toaster and can opener cords. Irvine called his wife, who immediately called 911.

Several officers with the Metro Nashville Police Department responded to the address and began processing the crime scene. Near the victim's head, officers discovered a can of Vietti chili, which was dented and coated with blood. Near the victim's feet, a dented and bloody can of Sweet Sue chicken and dumplings was found. Officer Blackwood processed the two cans for fingerprints, and a right thumb print was lifted from the can of chicken and dumplings. Officers also collected several blood samples and fingerprints throughout the home. It was confirmed that the latent print found on the can belonged to the Appellant. Co-defendant Thompson's prints were found on the telephone in the den and on the bathroom doorway. Autopsy results indicated that the cause of the victim's death was multiple blunt force injuries to the head and neck, with his neck being essentially broken. Additionally, there were multiple abrasions and contusions on the victim's face, hands, shoulder, and arms. During the investigation, it was discovered that a television, a VCR, clothing of the victim, and a white Mercury Marquis belonging to the victim's mother were missing.

Thompson, the co-defendant, was known to frequent the Four Aces Bar on Dickerson Road. One of the bartenders working on November 29, 2000, testified that she saw Thompson and Stella Mae Mitchell, another bartender, at the bar that evening in a white four-door car. Additionally, the bartender stated that Thompson was in the bar trying to sell clothes, a television, and a VCR. The next evening, November 30, 2000, the stolen car was discovered parked next door to the Four Aces Bar. Testimony established that the car had been parked there since 10:00 or 10:30 p.m. the prior evening. Upon processing the car, several prints were lifted but were not identifiable. Additionally, blood was found on the driver's seat and on the steering wheel.

The investigation initially focused on Clayton Veach; however, he was eventually cleared of any involvement by Jan Crow, who gave police a statement that she was with Veach the entire night of the murder. However, Veach testified that Crow left the trailer for approximately three hours to pick up a television set from his boss, who lived a couple of blocks from the victim, arriving back at the trailer with a television and a roll of one hundred dollar bills. Crow eventually told police about "Travis" and provided his description to a police sketch artist.

On December 22, 2000, an officer with the Metro Police Department noticed two cars parked in an alley known for drug activity. The officer subsequently was informed that one of the cars was stolen. The Appellant was in the second car and spoke with the officer, giving his name as Gary Larry Lopez. The officer eventually ascertained the Appellant's true identity and that a warrant was outstanding for his arrest for theft.

On December 23, Thompson was interviewed by police and denied any knowledge of the crimes. He asserted that he did not know the Appellant or the victim and that he had never been to the Harding Place address. However, at trial Thompson testified that he did meet the Appellant on the night of the murder. According to Thompson, he was riding around with an acquaintance, and they stopped at a Mapco station. At this point, "Jeff" and the Appellant, whom Thompson had never met, got into the car. The issue of marijuana came up, and the Appellant stated he knew where some could be purchased. After driving to the victim's residence, the Appellant went into the house but was told to come back later. The group returned to the victim's house around 8:00 p.m.

Thompson testified that the Appellant entered the house alone, leaving the three other individuals in the car. The Appellant was in the house for approximately thirty minutes before motioning Thompson into the house. Upon entering the house, Thompson went to the bathroom, and, while he was using the bathroom, he heard arguing. When he emerged from the bathroom, he saw the victim and the Appellant fighting in the den area. In response to Thompson's questioning, the Appellant shouted, "[H]e owes me." The two eventually fell into the kitchen area, and Thompson saw the Appellant with a can in his hand beating the victim. The struggled continued, and the Appellant eventually grabbed a second can and hit the victim in the back of the head. Thompson stated that there was no time for him to intervene and stop the fight.

At this point Thompson looked out the window and saw that the other two men had left. He stated that he returned to the den and picked up the phone to call for help. However, he was interrupted by the Appellant who told him to put the phone down and offered to give him a ride. Thompson testified that the Appellant took a television and a VCR with him when they left in the white car that was at the victim's residence. They then drove to the Four Aces Bar where the Appellant tossed a wallet into the dumpster.

An inmate, Fred Hunter, encountered the Appellant and Thompson during their incarceration at the Criminal Justice Center. According to Hunter, the Appellant approached him and indicated that Thompson was going to kill the Appellant because he had gotten Thompson involved in a murder charge. According to Hunter, the Appellant said that Thompson did not really kill the victim and that the victim was killed with a "can of pork and beans or something."

The Appellant and Thompson were jointly indicted and tried on charges of premeditated first degree murder and, in the alternative, felony murder, as well as for theft of property over $1000. After hearing the evidence presented, the jury convicted both the Appellant and Thompson of first degree felony murder and theft over $1000. The Appellant was subsequently sentenced to a term of life imprisonment for the murder conviction and a term of five years for the theft conviction, to

be served concurrently. The trial court denied the Appellant's motion for new trial on August 21, 2003, with this appeal following.

**Analysis**

On appeal, the Appellant has raised four issues for our review: (1) whether the evidence is sufficient to support the convictions; (2) whether the trial court erred in allowing a police officer to testify that the orientation of a fingerprint on an object may reveal how the item was held; (3) whether the trial court erred by excluding a hearsay statement made by a witness indicating her possible involvement in the crime; and (4) whether the court correctly instructed the jury that they must unanimously acquit the Appellant of the greater offense before considering any lesser included offenses.

## I. Sufficiency of the Evidence

First, the Appellant asserts that the evidence presented at trial was insufficient to support the convictions for both felony murder and theft. Specifically, he argues that his convictions are "based almost exclusively upon the testimony of his codefendant." While acknowledging that the decision of whether to accredit the co-defendant's testimony was a question for the jury, he asserts that the evidence presented was insufficient to justify a finding of guilt beyond a reasonable doubt.

In considering this issue, we apply the rule that where the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see also* Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court will not reweigh or reevaluate the evidence presented. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

"A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Although a conviction may be based entirely upon circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1974), in such cases, the facts must be "so clearly interwoven and

connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991) (citing *State v. Duncan*, 698 S.W.2d 63 (Tenn. 1985)). However, as in the case of direct evidence, the weight to be given circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958) (citations omitted).

The Appellant was convicted of first degree felony murder, which is defined in pertinent part by Tennessee Code Annotated section 39-13-202(a)(2) (2003) as a "killing of another committed in the perpetration of or attempt to perpetrate any . . . theft." Under the felony murder rule, it is immaterial whether the killing of the victim by the defendant was intentional or accidental, as the requisite intent for felony murder is the defendant's intent to commit the underlying felony. Tenn. Code Ann. § 39-13-202(b). A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103 (2003).

The proof at trial, while not overwhelming, was sufficient to support the convictions. Thompson's testimony placed the Appellant at the scene of the murder, and Thompson stated that it was the Appellant who beat the victim to death with two cans of food, while shouting "he owes me." Additionally, Thompson testified that the Appellant took the television, the VCR, and the car, thus, providing proof of the theft. We acknowledge that had this been the only proof presented against the Appellant, it would have been insufficient, as a conviction may not be based solely upon the uncorroborated testimony of an accomplice. *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). Here, however, sufficient corroborating evidence was presented to the jury. *See State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

The proof also established that the Appellant met the victim through Jan Crow and that he had visited the victim's home on at least one prior occasion, even spending the night there. Flatt testified that when someone knocked on the victim's door on the night of the murder, the victim identified the person as "Jan's friend." Additionally, proof was presented which established that the fingerprint found on the can of chicken and dumplings, an instrument used to produce death, was the Appellant's right thumb print. The can was found on the floor, dented and bloody. The jury was free to reject the Appellant's assertion that the print was placed there earlier when he was searching for food. Moreover, the Appellant's statement to Priscilla Floyd, that he had done something bad and would be going to jail for awhile, and the statement to inmate Fred Hunter, that he had gotten Thompson involved in a murder charge for which Thompson did not commit, are corroborative admissions of the Appellant's involvement in the crimes. From these facts, a jury could have concluded that the Appellant was guilty of felony murder and theft. Any inconsistencies or questions of credibility were placed before the jury. Questions of credibility of the witnesses are for the jury to determine. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *Cabbage*, 571 S.W.2d at 835. After reviewing the facts in the light most favorable to the State, we conclude that the evidence presented at trial is legally sufficient to support the convictions. This issue is without merit.

## II. Fingerprint Testimony

Second, the Appellant argues that the trial court erred in permitting Officer Blackwood to give "expert testimony" regarding how the orientation of a fingerprint may reveal how the item was held. He contends that the testimony as given was extremely prejudicial to his case in that it "unfairly influenced the jury to conclude that the only way [the Appellant] could have left his fingerprint on the Sweet Sue chicken and dumplings can was by holding the can in a particular way, which furthered the State's theory."

The specific testimony objected to by the Appellant is as follows:

Then you have orientation. When you find a fingerprint on an object, a lot of times that fingerprint will help to - - it shows relationship. In other words, how you grab something. If you're grabbing something this way or you're grabbing something this way. And we can tell that through the documentation, the print itself and the documentation that we do when we record a fingerprint.

For an example, if you have a piece of glass and it's in a window. Now then, if this glass is broken and we find say like four fingers on the outside near the broken edge and one finger, the thumb on the inside of where that glass - - right on this edge, then of course you can presume that that print was left on that object after it was broken because it's almost physically impossible unless you went around on one side and tried to turn your hand in such an orientation and ran around to the other side and touch it like this. So also, the relationship that you have, in other words, the frequency and the style of touching that you would do to something. If you're going to be aggressive with something and handle it more and more and more, then you would handle it differently than you would do a casual touch to an object.

At this point, the Appellant's trial counsel objected, stating "I think he's bordering on expert testimony in this regard and I don't know if he's talking about - - I think speculation from without an expert and foundation."

The proof established that Officer Blackwood was a twenty-six year veteran with the Metro Police Department and that he had worked in the "ID latent lab" processing fingerprint evidence for the last five years. The officer testified that he had processed hundreds of crime scenes, had attended the FBI Academy program for fingerprint identification, and had attended at least thirty schools involving crime scene investigation. The State argued that Officer Blackwood was "very well qualified to explain to the jury how he goes about lifting prints and what he looks for as far as spatial relationship." The trial court agreed.

The admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court's exercise of discretion will not be

reversed on appeal unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

First, we would note that the Appellant offered no objection when Blackwood testified in detail regarding other processes involved in his work, including the collection and storing of evidence, the process of dusting for fingerprints, the types of objects from which the best prints can be developed, and the various possible reasons one cannot obtain usable prints. Moreover, in this case, the officer's testimony regarding the manner in which an object is held did not require the qualification of an expert. *See* Tenn. R. Evid. 702. Our rules of evidence permit opinion testimony of a lay witness when it is (1) rationally based on the perception of the witness and (2) the opinion is helpful to a clear understanding of the witness's testimony on the determination of a fact in issue. Tenn. R. Evid. 701. Our review of the officer's testimony demonstrates that his testimony was rationally based upon his experience and training and was helpful in understanding an issue of fact in the case. This issue is without merit.

## III. Exclusion of Testimony

Next, the Appellant contends that the trial court erred by excluding a statement made by Jan Crow to her ex-husband, Clayton Veach, which potentially implicated her in the murder of the victim. Specifically, he asserts that proper application of *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038 (1973), and *State v. Brown*, 29 S.W.3d 427 (Tenn. 2000), should have resulted in admission of the testimony.

As part of his defense, co-defendant Thompson attempted to elicit testimony from Clayton Veach regarding a statement made to him by Jan Crow on the morning following the murder. In a jury-out hearing, Veach testified that he became aware of the murder when he received messages on his cell phone from his daughter. He testified that after he laid the phone down in the seat, Crow picked up the phone, heard the messages, and " called somebody and then she said that he was killed with a can of chili and he wasn't supposed to have gotten killed . . . ." The State objected, arguing that the statement was inadmissible hearsay. Co-defendant's counsel argued that the statement was admissible under the excited utterance exception.

The trial court ruled that the testimony was not admissible, finding that:

There's no hearsay rule here. The defense did not lay foundation as an excited utterance. Can't use the declaration against interest because there's obviously an available witness. We heard from her.

 . . . .

Now, could I use *State v. Brown* and *Chambers v. Mississippi* to override the evidence rules, yes, but that would be only under circumstances in which this

evidence was really crucial and pointed the finger at someone else. You know, let's even accredit this statement, he was supposed to get killed. All that tells me is that she might have been involved in this theft murder. It doesn't indicate that these two defendants are not guilty. That's all it tells me. So I'm not going to use *State v. Brown* or *Chambers v. Mississippi* under these circumstances to override the evidence rules.

The Appellant's counsel noted for the record that he joined in the objection to the court's ruling denying admission of the hearsay statement.

Initially, we note that the Appellant has waived this issue by failing to include it in his motion for new trial. Tenn. R. App. P. 3(e). Nonetheless, we elect review.

Essentially, the Appellant is arguing that he was deprived of his constitutional right to be afforded a meaningful opportunity to present a complete defense by establishing Jan Crow's possible involvement in the murder and theft of the victim. It has long been recognized by the courts of this state that an accused is entitled to present evidence implicating others in the crime. *State v. Powers*, 101 S.W.3d 383, 394 (Tenn. 2003). A defendant's right to present a defense, which includes the right to present witnesses favorable to the defense, is guaranteed by the Sixth Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See* U.S. CONST. amend. VI, XIV. "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302, 93 S. Ct. at 1049. However, there are instances where otherwise inadmissible evidence must be admitted in order to protect the constitutional rights of the accused. *Brown*, 29 S.W.3d at 436. Our supreme court has stated:

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of the evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

*Id.* at 433-34 (citing *Chambers*, 410 U.S. at 298-301, 93 S. Ct. at 1047-49). This court must consider and balance the principles of relevance and hearsay under the Tennessee Rules of Evidence with the rights of the accused to confront and cross-examine witnesses and to call witnesses in his defense when determining whether the evidence is admissible.

It is undisputed that the statement in question was hearsay. We agree with the trial court that neither the excited utterance nor the declaration against interest exception applies. We note that while the constitutional right to present a defense has been held to "trump" the rule against hearsay, after careful consideration, we conclude that the statement is not admissible under the facts of this case. In our view, the exclusion of the statement made by Jan Crow did not deprive the Appellant

of his right to present a defense. As the trial court found, the statement was not critical to the defense. Even if we assumed the statement to be true, it, at most, would have only implicated Jan Crow as an accomplice or co-conspirator. Nothing in the statement negated the greater of the evidence which established that the Appellant committed the crimes. Thus, we are unable to conclude that the trial court abused its discretion in excluding the hearsay testimony.

## IV. Jury Instructions

Last, the Appellant asserts that the jury instruction with regard to lesser included offenses violated his rights under both the United States and Tennessee Constitutions because it implied that the jury "must unanimously acquit of the higher charge before being allowed to move to a lesser charge." The Appellant contends that the instruction "encouraged the jury to convict . . . [him] of first degree murder[,] . . . interfered with its choice of lesser included offenses[,] . . . [and] deprived [him] of his right to a jury trial on the lesser offenses." The trial court instructed the jury as follows:

> If you, the jury, unanimously determine that the State has proven the defendants, Augustine Lopez, III and Fred Thompson, Junior guilty of felony murder by proof beyond a reasonable doubt then you will find the defendants guilty of felony murder and mark the verdict form accordingly move on to count two. On the other hand, if you find the defendants, Augustine Lopez, III and Fred Thompson not guilty of felony murder or if you have reasonable doubt thereof, then your verdict must be not guilty as to this offense and next proceed to determine their guilt or innocence as to the lesser included offense of second degree murder.

The court then proceeded to instruct the jury on the lesser included offenses of second degree murder, reckless homicide, and facilitation.

This court has repeatedly held that sequential jury instructions, like the one presented for review in this case, are proper. *State v. Raines*, 882 S.W.2d 376, 381-82 (Tenn. Crim. App. 1994); *see also State v. Harris*, 947 S.W.2d 156, 175-76 (Tenn. Crim. App. 1996); *State v. McPherson*, 882 S.W.2d 365, 375-76 (Tenn. Crim. App. 1994); *State v. Rutherford*, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993); *State v. Stanley Earl Cates*, No. E2003-02648-CCA-R3-CD (Tenn. Crim. App. at Knoxville, Dec. 20, 2004); *State v. Joe A. Gallaher*, No. E2001-01876-CCA-R3-CD (Tenn. Crim. App. at Knoxville, June 25, 2003). We find these decisions controlling upon the issue. The trial court instructed the jury on all proper lesser included offenses of the charge of felony murder as required by statute. The instruction did not preclude the jury from considering the lesser charges. This issue is without merit.

**CONCLUSION**

Based upon the foregoing, the judgments of conviction for first degree felony murder and theft of property over $1000 are affirmed.

_____
DAVID G. HAYES, JUDGE