# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 12, 2005 Session

## MONTEA WILSON aka MARCUS FLOYD v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-29290     Joseph B. Dailey, Judge**

---

**No. W2004-01881-CCA-R3-PC  - Filed September 21, 2005**

---

The petitioner, Montea Wilson, aka Marcus Floyd, was convicted by a jury of felony murder and attempted especially aggravated robbery in 2000. The jury sentenced the petitioner to life in prison without the possibility of parole for the felony murder conviction, and the trial court merged the attempted especially aggravated robbery conviction with the felony murder conviction. This Court affirmed the petitioner's convictions on direct appeal. See State v. Montea Wilson, No. W2000-00748-CCA-R3-CD, 2002 WL 925255 (Tenn. Crim. App., at Jackson, May 3, 2002), perm. app. denied, (Tenn. Nov. 4, 2002). The petitioner filed a pro se petition for post-conviction relief, alleging ineffective assistance of counsel, among other things. The petition was amended by counsel. At the evidentiary hearing on the petition, the post-conviction court refused to let the petitioner's attorney question trial counsel about his requests for jury instructions on lesser-included offenses, determining that the issue was waived or previously determined. At the conclusion of the hearing, the post-conviction court denied the petition for post-conviction relief. After a review of the record and applicable authorities, we determine that the post-conviction court improperly concluded that several of the petitioner's issues were waived or previously determined, denying the petitioner a full and fair hearing on the petition for post-conviction relief. Accordingly, we remand the matter for a full and fair hearing on the issues presented in the post-conviction petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Remanded**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Montea Wilson, aka, Marcus Floyd.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Betsy Carnesale, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In February of 2000, the petitioner was convicted of felony murder and attempted especially aggravated robbery. The trial court merged the attempted especially aggravated robbery conviction into the felony murder conviction. The jury sentenced the petitioner to life without the possibility of parole.

The petitioner appealed. On direct appeal, the petitioner argued: (1) that the evidence was insufficient; (2) that the trial court erred by failing to exclude certain evidence as unfairly prejudicial; (3) that defense counsel was erroneously prohibited from making a full opening statement; (4) that the trial court erred by denying a defense request for expert witness funds; (5) that prior robbery convictions were erroneously admitted for impeachment purposes; (6) that the trial court erred by limiting the testimony of defense witness Sammie Ballard; and (7) that the trial court erred by permitting certain testimony at a suppression hearing. This Court affirmed the petitioner's conviction. See State v. Montea Wilson, No. W2000-00748-CCA-R3-CD, 2002 WL 925255 (Tenn. Crim. App., at Jackson, May 3, 2002), perm. app. denied, (Tenn. Nov. 4, 2002). The pertinent facts, as stated by this Court on direct appeal, are as follows:

> On December 2, 1997, there was an attempted armed robbery at Ace Check Cashing on Getwell Road in Memphis. At trial, the state submitted the prior sworn testimony of Janice Hogue, the Ace Cash Express Director of Security and Facility Management, who was employed in the corporate office. Ms. Hogue's testimony established that Ace Cash Express, a nationwide business with branches providing check cashing and money order services, generally used armored cars to deliver cash to each branch. The policy was to permit each branch to maintain a maximum level of cash on the premises and, when that level was reached, employees were required to request special armored car pick-up services. At the end of each work day, any cash on hand was to be placed in a safe and the alarm activated. There were no security cameras. Ms. Hogue's testimony was that the victim, Cecil Wayne Goldman, who managed the branch located on Getwell Road, set the alarm system at 6:47 p.m. and had 90 seconds to exit the building. The branch had approximately $27,000 in cash at closing, an unusually large amount.

> Shirley Smith testified that on the evening of the offenses, she was entering the Wendy's restaurant on Getwell when she heard several individuals arguing loudly at Ace Check Cashing next door. She saw two young black men with the victim in front of the business and overheard one of the black men say, "You dumb ass . . . ." There were three gunshots and the victim fell to the ground. The black men left the scene on foot, crossing through the Wendy's parking lot towards the Greenwich Square apartments. The victim, who was carrying papers and office supplies in a cardboard box, had been shot and was bleeding. Ms. Smith recalled the gunman was wearing a dark blue jacket.

. . . .

Quiana Payne, who lived in the Greenwich Square apartments and considered the defendant to be her boyfriend, testified that on the evening of the murder, she contacted the defendant on his cellular telephone. He responded that he was "taking care of business" and would call back, then immediately hung up. Three days later, Ms. Payne saw the defendant at the residence of Anita Hunter, where he lived. She recalled that the defendant packed clothes and a black-handled .380 semi-automatic pistol into a gym bag. Later, when she learned of the defendant's involvement in the victim's murder, she returned the bag to Ms. Hunter's residence. Ms. Payne also identified the .380 pistol recovered by Officer Rewalt as that of the defendant. . . .

. . . .

Officer Bryant G. Jennings, a member of the Memphis Police Department Crime Scene Unit, executed a search warrant at the apartment shared by Anita Hunter and the defendant. He stated that officers seized a small safe, a small piece of black cloth with cut-out holes, and a pair of black gloves.

. . . .

Darius Bowles, indicted for the same offenses as the defendant, testified that he first met the defendant, whom he also knew as "LA," in December of 1997 through his cousin, Javon Webster.[1] He stated that on the day of the murder, the defendant, accompanied by Webster and Vincent Broddy, picked him up in a maroon Honda and drove around for approximately two hours before arriving at the defendant's apartment in Greenwich Square at approximately 6:00 p.m. He testified that the defendant, who claimed to be a member of the International Black Mafia, planned the robbery of the Ace Check Cashing, arranged everyone's participation, and discussed a four-way split of the proceeds. Bowles stated that the defendant provided him and Webster with weapons, instructing him to be a "look-out" for Webster, who was to apprehend the victim. He claimed that the defendant developed a plan whereby Webster was to confront the victim outside, return him to the store, and force the surrender of the cash. Bowles recalled that the defendant believed they could recover $50,000 to $75,000 in cash. He identified the Morrison .380 recovered from the trash can by Officer Rewalt as the one given to Webster and the black-handled .380 as the gun he was provided.

According to Bowles, the men positioned themselves outside of the store at 6:30 p.m. to wait on its closing. He testified that he and Webster were stationed in bushes outside of Ace Check Cashing with Jasper Temple, who lived in the Greenwich Square apartment complex and who had agreed to participate in the robbery. Temple used a walkie-talkie to communicate with the defendant and Broddy, who were located across the street. Bowles testified that he was wearing a blue Adidas sweatshirt, gray jogging pants, and black and white Air Jordan tennis

---

[1] Javon Webster was convicted of felony murder and attempted especially aggravated robbery as a result of these offenses. This Court affirmed his convictions on February 7, 2002. See State v. Javon Webster, No. W2000-01912-CCA-R3-CD (Tenn. Crim. App., at Jackson, Feb. 7, 2002).

shoes. The other members of the group were generally wearing dark clothing. Bowles recalled that when the defendant provided the code word "A-okay" over the walkie-talkie, Webster ran to the door of Ace Check Cashing. Bowles, who followed Webster, contended that the victim "started hollering," panicked, and threw a box at Webster. Webster wrestled briefly with the victim and, as Temple yelled, "Shoot him," shot three to four times. Bowles testified that after the shooting, he ran through a field and the Wendy's restaurant parking lot to the Greenwich Square apartments. Afterward, the five men met at a green generator in the complex, where he and Webster returned their guns to the defendant. Bowles contended that he asked Webster why he shot the victim and Webster was unable to explain. He estimated that the men waited for approximately 30 minutes before the defendant drove them home. The defendant said, "Just be cool," and informed him that he would telephone the next day. Bowles was arrested three days later and showed police where to find the defendant. While acknowledging that he had belonged to a gang, Bowles contended that he committed the crimes for money and that they were not gang-related.

During cross-examination, Bowles maintained that he had joined the Crips gang in early 1997 and quit midway through the year. He denied that he had ever achieved a rank in the gang or "thrown" gang signs. Bowles agreed, however, that Webster, Broddy, and Temple were Crips. He admitted telling police that his cousin, Webster, had stated that he intended to rob Ace Check Cashing and invited him along. He also acknowledged that he initially lied to police by telling them that he did not know his cousin's last name. Bowles agreed that he did not mention Broddy in his first statement to police, but denied that he had protected him out of gang allegiance. He testified that the defendant, at the time of the offenses, was dressed in jeans, a silver coat, and tennis shoes.

. . . .

Captain John A. Wilburn, who was a sergeant in the Memphis Police Department homicide division at the time of the murder, testified that he took a recorded statement from the defendant on December 11. When he learned that the defendant wanted to talk, he checked him out of jail and transported him to the homicide offices. After being advised of and waiving his Miranda rights, the defendant gave the following statement:

> After I got back from Mississippi, me and [Broddy] drove into Greenwich Square apartments and I run into [Webster] and [Bowles], "[T]ip" and Billy all standing around outside in the back of the cove. We all were sitting out there talking for a second. Webster decided that they wanted to go and rob the check cashing place over there on Getwell. [Webster] asked if anybody had any units (guns). [Broddy]

-4-

said, "Yeah, I got a .380." I said, "Well, I got a gun too." So, [Webster, Bowles], Billy and Tip decided they would go rob the check cashing place. They asked me if I would watch out for the police. [Bowles] had already had the walkie-talkie's and we were playing with them outside.

[Broddy] gave [Webster] his .380 and I had a .380 that I gave to [Bowles]. Billy went inside his house and put on some black clothes, [Broddy] had already had on some black (clothes), and Billy, [Webster, Bowles], Tip and [Broddy] walked down to the check cashing place. When they walked down there, [Bowles] had a walkie-talkie[;] [Broddy] had a walkie-talkie. [Broddy] and Billy were gon' stand on the opposite side of the street, and Tip and [Webster] and [Bowles] were gon' be in the bushes, and I was gon' ride up the street and see if I saw any police. If I saw the police, I was instructed to blow the horn.

I rode up Getwell to Amoco gas station, turned around, I came back to the Greenwich Square apartments. Then I rode back up to the Amoco gas station. As I was riding back up to the Amoco gas station, I heard three (3) shots go off. When I looked over toward the check cashing place, I saw [Webster] struggling with the guy that was inside . . . . That's when the guy had a box or something . . . I saw that fly up in the air. That's when I heard the shots. I saw Webster shoot the guy three (3) times. My window was down, I heard the guy hollering for help, and he was screaming.

I drove on down to American Way, made a left and went down to Lamar, came back up to Knight Arnold, made a left and came back around to Getwell. Went back to Greenwich Square apartments. That's when they all came running back over there. That's when [Bowles, Webster, Broddy], Billy and Tip came running back over there to the apartments. They came inside my sister's apartment, and [Webster] said, "Man, I didn't get no money. The guy was grabbing on me." We sat around there and we talked for a couple more minutes. Everybody got scared. I went outside, me and [Broddy] were outside and security guards were telling us that they were looking for some guys dressed in black, for us to go in the house.

Billy went home, Tip went home and I took [Webster] and [Bowles] home. [Webster] took the gun with him, the .380 that he used. The other gun was left there at my sister's apartment. [Bowles] took the walkie-talkie's back to the guy that loaned them to him.

Captain Wilburn executed a search warrant at the defendant's apartment on December 9, one week after the murder. During the search, he and other officers seized a black bag containing a black jumpsuit and a smaller black bag with the black-handled .380 inside.

. . . .

Anita Hunter testified that at the time of the offenses, the defendant was living with her in her Greenwich Square apartment. She stated that she and the defendant were "friends" and acknowledged that the defendant had two to three other girlfriends. Ms. Hunter recalled that when she returned home after work at approximately 5:30 p.m. on the day of the murder, the defendant was not there, but that he was acting normally when he returned at 9 or 9:30 p.m. At approximately 10:30 p.m., she left for work and could not remember whether the defendant was at the apartment when she returned the next morning. Upon cross-examination by the state, she confirmed that on the date of the murder, the defendant, pursuant to her request, was in the process of moving out of her apartment.

Denise Wright, who was dating the defendant in December of 1997, testified that at that time, the defendant was living with Anita Hunter, whom she believed to be his sister. She recalled that she visited that apartment on five or ten occasions and would occasionally spend the night. Ms. Wright testified that she had once seen the Morrison .380 police found in the Poplar Street trash can. It was on a night stand in the den at the apartment. The defendant and Broddy were the only others present. Ms. Wright claimed that on the day of the murder, the defendant was at her apartment from approximately 5:00 or 5:30 p.m. until 9:00 p.m except for a period of ten or 15 minutes at 6:45 p.m. when he left after receiving a cellular telephone call or page. Ms. Wright contended that because employees of the district attorney's office had tried to confuse her during pre-trial questioning, her statement contained error regarding the timing of various events. She maintained that her trial testimony was truthful.

During cross-examination, Ms. Wright acknowledged that she had reviewed her pre-trial statement and had not asked for corrections. She claimed that the black-handled .380 found in the gym bag in the defendant's apartment was hers, as was the car the defendant was driving on the day of the murder. She admitted that in her prior statement, she told authorities that the defendant and Broddy had accompanied her to Mississippi on the day of the murder to pick up her child, leaving at approximately 3:00 p.m. and returning an hour and one-half later. Ms. Wright acknowledged that she told investigators that she had loaned the defendant her car for the remainder of the day and that he brought it back to her at approximately 8:00

p.m. She also acknowledged that she had initially stated that she then drove Broddy and the defendant home, drove back to her apartment briefly, and then returned to the defendant's apartment.

The defendant, who was 28 years old at the time of trial, testified that his real name was Marcus Montea Floyd. He acknowledged that he had been convicted of theft in 1991, robbery twice in 1993, and criminal impersonation in 1997. The defendant stated that in November and December of 1997, he lived with Anita Hunter, with whom he had had a prior sexual relationship. He acknowledged that during that time, he simultaneously dated several women without advising any of them of his multiple relationships. He and Ms. Hunter referred to one another as "brother" and "sister." The defendant testified that at the time of the offenses, he had known Vincent Broddy for approximately one month and the remainder of those involved for a matter of weeks. He maintained that the gun used by Webster belonged to Broddy and that the one used by Bowles belonged to Denise Wright. The defendant stated that on the day of the murder, he awakened at 5:15 or 5:30 a.m. to call in to work because he was not feeling well. He claimed that he then drove Denise Wright to her residence and returned to his apartment to sleep. The defendant testified that at approximately 11:30 a.m., Broddy, Webster, and Bowles arrived at his apartment and asked whether he still had the gun belonging to Ms. Wright. Contending that he was not in a gang and had never heard of the International Black Mafia, he accused Broddy, Webster, Bowles, and Temple of being members of the Crips gang. The defendant claimed that he gave the gun to Bowles without asking the three men their intentions and that the men left his apartment at approximately 12:30 p.m. He stated that he remained at his apartment until returning to Ms. Wright's residence at approximately 5:00 p.m. The defendant stated that he stayed at Ms. Wright's for two to three hours before leaving for ten to 15 minutes after receiving multiple pages from Quiana Payne. He explained that he went to a local store to purchase cigarettes and call Ms. Payne and then returned to Ms. Wright's apartment where he watched television for the remainder of the evening.

The defendant testified that during the next two days, he saw police officers canvassing the area, passing out fliers and Crime Stoppers information. He stated that three days after the murder, he called Crime Stoppers and identified Webster and Bowles as the assailants. The defendant contended that he would not have called Crime Stoppers had he committed the crimes. He claimed that after conversing with Officer Ballard several times that day, he acquired the Morrison .380 from Broddy, wrapped it in a plastic bag, and placed it in a garbage can on Poplar for police. The defendant testified that he acknowledged to Officer Ballard that "LA," was his nickname, which stood for "Ladies All the Time." The defendant claimed that he drove to Ms. Hunter's apartment to return her car and was arrested by police. He testified that he gave officers the alias Montea Wilson because he had a prior record in his own name. The defendant contended that the statement that he gave police on

-7-

December 11 was false because he "wanted to give them everything that they wanted at that particular time." He maintained that they wanted him to place himself at the scene so that he would be a good witness and that he acquiesced in their request. The defendant denied any role in planning the offenses.

During cross-examination, the defendant claimed that he had falsely testified at a suppression hearing that he was at Anita Hunter's apartment at the time of the offenses. He also acknowledged that he had lied during his direct examination by testifying that his two prior robbery convictions were for offenses occurring on the same date. The defendant admitted that his resume indicates that he graduated from Crenshaw Senior High in California when he actually failed to complete high school at Jackson Central Marion in Jackson, Tennessee. He testified that he lied extensively in his first statement, at which time he told police that he was in Mississippi at the time of the crimes and that Webster and Bowles had confessed to the murder while riding around in a car. The defendant contended that he gave a second statement admitting his own involvement only because the police told him that his first statement was "no good" because he was not at the scene. He explained that he lied at the suppression hearing only because he was concerned about being charged with perjury and wanted his testimony to be consistent with his second statement.

State v. Montea Wilson, 2002 WL 925255, at *1-7. After being convicted, the petitioner filed a timely petition for post-conviction relief, arguing inter alia that trial counsel was ineffective for failing to request jury instructions on the lesser-included offenses of felony murder, including second degree murder, reckless homicide, criminally negligent homicide, and voluntary manslaughter, and failing to raise the issue on direct appeal.

<u>Evidence at the Post-Conviction Hearing</u>

At the post-conviction hearing, the following evidence was admitted. Initially, counsel for the petitioner attempted to question trial counsel about his failure to seek instructions at trial on lesser-included offenses. Counsel for the State objected, and the trial court sustained the objection, refusing to permit petitioner's counsel to question trial counsel on the matter. The post-conviction court determined that:

[T]he duty is on the trial court to charge the appropriate lesser offenses. The trial court charged what he thought was appropriate. The Court of Appeals clearly had the authority to decide plain error had they so-chosen, as they have done on many occasions since then and reversed. They chose not to, and so I do think that this is an issue that has either been previously litigated or waived, and I'll sustain the objection, but I'll note your exception.

The post-conviction court also prohibited the petitioner's counsel from questioning trial counsel as to why he did not raise the issue of lesser-included offenses on appeal.

Trial counsel testified that he had been practicing law since 1960 and that he had a co-counsel appointed on the petitioner's case because it was initially a death penalty case. Trial counsel explained that he met with the petitioner on numerous occasions and described the petitioner as "articulate."

Co-counsel testified that he had been practicing law for thirteen (13) years at the time of trial and explained the theory of the defense strategy as one of facilitation. Co-counsel admitted that the petitioner was evaluated by a mental health professional and was found to have some mental health issues, but the evaluation results indicated that none of the mental health problems created a diminished capacity.

The petitioner claimed that his attorneys forced him to testify at a motion hearing on the motion to suppress. He admitted that trial counsel visited him at jail, but that there was never a trial strategy discussed. The petitioner claimed that he only met with co-counsel "very briefly and not too many times," but that he "came in very late during the course of [his] defense." The petitioner also stated that neither of the trial attorneys discussed the petitioner's mental state with him. The petitioner further claimed that he did not give permission for the amendment of the indictment. The petitioner admitted on cross-examination that he was provided with a copy of all of the discovery and that the ultimate decision to testify was his to make.

At the conclusion of the brief evidentiary hearing, the post-conviction court denied the petition for post-conviction relief.

## Analysis
## Post-Conviction Standard of Review

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issue raised, we will afford those findings of fact the weight of a jury verdict, and this court is bound by the court's findings unless the evidence in the record preponderates against those findings. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. See State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001)

At the hearing, the post-conviction court refused to allow any testimony relating to trial counsels' failure to request lesser-included offenses at trial or raise the issue on appeal, determining

that the issue was either "previously determined" by this Court on direct appeal, or waived for failure to present it on direct appeal. In its order dismissing the petition, the post-conviction court stated:

> As developed in the proof at the evidentiary hearing, the initial complaint against trial counsel dealt with matters that had been either previously litigated or waived. This included numerous items that the petitioner felt his attorney should have raised on direct appeal but failed to do so. As was explained at the evidentiary hearing, some of those matters were considered and discussed and specifically eliminated as assignments of error on appeal because it was determined that they did not have sufficient merit to warrant raising them. Other matters were not raised on appeal because the case law was such at [the] time that they were not appealable issues. Other complaints by the petitioner involved specific concerns about the Motion to Suppress that was filed, health issues of defense counsel, failure to object to the amendment of the indictment, and general trial strategy concerns. A careful review of the facts and the transcripts have convinced this Court that this petitioner received outstanding representation at his trial. That the verdict rendered by the jury was not one that pleased this petitioner is not the standard by which the effectiveness of trial counsel is measured nor can one second guess, after the fact, trial strategy which was reasonable and logical at the time it was employed.

Thus, the post-conviction court reasoned that the petitioner had "waived" his issues regarding lesser-included offense instructions for failure to raise those issues on direct appeal. However, the petitioner's complaints do not involve the issues themselves; rather, the petitioner's complaints relate to counsel's ineffectiveness in failing to properly pursue and preserve these issues involving lesser-included offense instructions. See Howard Eugene Buchanan v. State, No. M2003-01815-CCA-R3-PC, 2004 WL 1114589, at *5 (Tenn. Crim. App., at Nashville, May 19, 2004), perm. app. denied, (Tenn. 2004) (determining that despite defendant's failure to seek review of trial court's failure to instruct the jury on alibi in a motion for new trial or on direct appeal, this Court could review a claim of ineffective assistance of counsel alleging that counsel was ineffective for failing to raise the alibi issue). Although the substantive claims that under-lie the petitioner's allegations of counsel's deficient performance have been waived, we conclude that the petitioner has not waived his claim of ineffective assistance of counsel.

Further, the post-conviction court repeatedly stated that the petitioner's issues regarding lesser-included offense instructions had been previously determined by this Court's failure to sua sponte find plain error in the petitioner's trial during our examination of his case on direct appeal. Clearly, issues that have been previously determined cannot support a basis for post-conviction relief. See Tenn. Code Ann. § 40-30-106(f); Harris v. State, 947 S.W.2d 156, 174 (Tenn. Crim. App. 1996). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-106(h) (emphasis added). This Court has never ruled on the merits of the petitioner's claims that lesser-included offense instructions should have been given at trial. Therefore, the post-conviction court's ruling that these issues have been "previously determined" is erroneous. Moreover, it appears the post-conviction court

misunderstood the petition as seeking to revisit the substantive lesser-included offense issue. We read the petition as asking for relief on a claim of ineffective assistance of counsel. Consequently, we determine that the post-conviction court prevented the petitioner from having a full and fair hearing on the issue of ineffective assistance of counsel as presented in his petition for post-conviction relief. Accordingly, we remand the case for reconsideration in accordance with this opinion.

## Conclusion

For the foregoing reasons, the matter is remanded to the post-conviction court.

_____

JERRY L. SMITH, JUDGE